UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - -x
UNITED STATES OF AMERICA           :

          -v-                      :    S2 06 Cr. 1179 (RJH)

ALEKSANDER LIPKIN, et al.,         :

             Defendants.           :

- - - - - - - - - - - - - - - - - -x


GOVERNMENT'S MEMORANDUM OF LAW IN OPPOSITION
            TO DEFENDANTS' PRETRIAL MOTIONS


                              MICHAEL J. GARCIA
                              United States Attorney for the
                              Southern District of New York
                              *Attorney for the United States
                              of America*

JONATHAN B. NEW
KATHERINE R. GOLDSTEIN
Assistant United States Attorneys
     *Of Counsel*

## Table of Contents

BACKGROUND. . . . . . . . . . . . . . . . . . . . . . . . . . 2

      A.   The Indictment.. . . . . . . . . . . . . . . . 2

      B.   The Investigation. . . . . . . . . . . . . . . 5

I.  There Is No Basis To Suppress The Court-Authorized Wiretap
Evidence In This Case... . . . . . . . . . . . . . . . . 6

      A.   Alternative Investigative Techniques Had Been
Tried And Failed Prior To Interception Or Were
Unavailable Or Unlikely To Succeed If Tried.. . . . . . 6

          1.   Applicable Law. . . . . . . . . . . . . .7

          2.   Analysis. . . . . . . . . . . . . . . 10

II.  Zhigun's Motion to Suppress Evidence Seized Pursuant
to a Court-Authorized Search Warrant Should Be Denied. . .20

      A.   Background.. . . . . . . . . . . . . . . . . 20

      B.   Applicable Law . . . . . . . . . . . . . . 23

      C.   Analysis.. . . . . . . . . . . . . . . . . 26

          1.   There Was Probable Cause
to Search PREMISES 2. . . . . . . . . . . 26

          2.   The Search Warrant Was Not
Based Upon Stale Information. . . . . . . 28

          3.   The Agents Executed the Warrant
in Good Faith.. . . . . . . . . . . . . 31

III. The Defendants' Requests for a Bill of Particulars
Should Be Denied.. . . . . . . . . . . . . . . . . . . 33

      A.   Applicable Law.. . . . . . . . . . . . . . . 33

      B.   Discussion.. . . . . . . . . . . . . . . . 37

IV.  Ciofalo's Motion for a Severance Should Be Denied. . . . 45

      A.   Ciofalo Is Properly Joined with the Other
Defendants and Is Not Entitled to Severance . 46

          1.   Applicable Law. . . . . . . . . . . . . 46

2.    Analysis. . . . . . . . . . . . . . . . .  49

B.    The Number Of Defendants Does Not Warrant A
Severance For Ciofalo. . . . . . . . . . . .  51

V.    Ciofalo's Motions for Early Disclosure of
Pre-trial Materials Should Be Resolved in Accord
with Standard Practices in this District.. . . . . . .  52

CONCLUSION. . . . . . . . . . . . . . . . . . . . . . .  58

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - -x
UNITED STATES OF AMERICA          :

          -v-                     :        S2 06 Cr. 1179 (RJH)

ALEKSANDER LIPKIN, et al.,        :

               Defendants.        :

- - - - - - - - - - - - - - - - - -x


**THE GOVERNMENT'S MEMORANDUM OF LAW
IN OPPOSITION TO THE DEFENDANTS' PRE-TRIAL MOTIONS**

          The Government respectfully submits this memorandum of
law in opposition to the pre-trial motions of defendants Galina
Zhigun, Garri Zhigun, Alexander Kaplan, Igor Mishelevich, Marina
Dubin, Igor Buzakher, Joseph Paperny, Daniel Mikhlin, Fuad
Yakubov, Ricardo Acosta, David Neustein, John Ciofalo, and Faina
Petrovskaya (collectively, the "Moving Defendants").  Those
motions can be broken down into five major categories: (i) a
motion to suppress Title III evidence from the wiretap of
defendant Alex Gorvits's cellphone ; (ii) a motion to suppress
evidence seized pursuant to a search warrant; (iii) requests for
various bills of particulars; (iv) a motion for severance; and
(v) requests relating more generally to discovery (including the
production of impeachment materials, the designation of documents
the Government intends to use at trial, Rule 404(b) notice, and
the like).  Defendants Zhigun, Kaplan, Yakubov, and Ciofalo have

1

each filed motions on one or more of these specific grounds with supporting memoranda of law.[1]  Defendants Garri Zhigun, Mishelevich, Dubin, Buzakher, Paperny, Mikhlin, Acosta, Neustein and Petrovskaya have joined in these motions to the extent that they are beneficial to themselves.  For the reasons set forth below, the Government respectfully submits that each of these motions should be denied in its entirety.

## Background

**A.    The Indictment**

On October 9, 2007, Indictment S2 06 Cr. 1179 (RJH) ("the Indictment"), which was returned by a Grand Jury sitting in the Southern District of New York, was filed.  The Indictment charged 27 individuals with participating in a mortgage fraud conspiracy from approximately 2004 through January 2007. Specifically, the indictment alleged that the defendants engaged in an illegal scheme to defraud various banks and lending institutions (the "lenders") by submitting applications and supporting documentation for dozens of mortgages and home equity

---

[1]    In this memorandum, because there is no joint defense memorandum of law, the Government will refer to each individual defendant's motion by the defendant's name (*i.e.*, "Yakubov Mem.").  The Government has also filed today the Affirmation of Assistant United States Attorney Jonathan New, with various exhibits containing Title III applications and other materials relevant to the Government's response to this motion.  When the Government refers to the agent's affidavit accompanying a Title III application or other relevant documents, the Government will note it as "New Aff., Ex. _ (Agent Aff.), ¶ ___".

loans with false or misleading information.  (Indictment ¶ 4).

        The defendants primarily operated their fraud scheme
out of the mortgage brokerage AGA Capital NY, Inc. ("AGA
Capital"), which had various offices in Brooklyn, New York.
(Indictment ¶ 1-3, 13-15).  Galina Zhigun was the owner and
registered broker of AGA Capital.  (Indictment ¶ 13).  Aleksander
Lipkin, Alex Gorvits, Igor Mishelevich and other defendants
worked for AGA Capital as mortgage brokers.  (Indictment ¶ 14).
Fuad Yakubov served as an intermediary between the mortgage
brokers and the straw buyers, who, among other acts, identified
properties for purchase, identified and recruited straw buyers,
and falsified certain information provided to the lenders, in
order to obtain mortgage or home equity loans.  (Indictment ¶
18).  John Ciofalo was a representative of one of the lenders
from whom the defendants fraudulently obtained mortgages and home
equity loans.  (Indictment ¶ 20).

        The Indictment describes in detail how the mortgage
fraud scheme worked.  The defendants identified properties for
sale in New York City, New Jersey and Sullivan County, New York,
and then purchased those properties with one or more mortgages
and/or home equity loans amounting to 100 percent of the purchase
price of the property.  (Indictment ¶ 5).  The defendants then
recruited individuals to act as "straw buyers" of the target
properties and then applied for loans on behalf of the straw

buyers.  (Indictment ¶¶ 6-7).  The defendants prepared and submitted to various lenders, loan applications and other documentation containing false and misleading information about the straw buyers' current residence, employment, income, assets, and existing debt.  (Indictment ¶ 8).  The defendants created false documents, such as bank statements and proof of income, that the lenders relied upon to verify the statements in the loan applications.  (Id.)  The defendants also falsely represented to the lenders that certain straw buyers intended to reside in the property that would secure each mortgage or loan, when, in fact, the defendants intended to use the property for their own investment purposes.  (Indictment ¶ 9).

The defendants sought mortgages and home equity loans for certain properties at values that were in excess of the properties' actual sale prices or fair market values.  To support applications for loans in excess of the properties' market values, the defendants procured artificially inflated appraisals. Using these false and misleading appraisals, the defendants received mortgages and other loans in excess of the actual sale price of the properties securing the loans.  The difference between the appraised value of the property and the property's actual sale price represented part of the defendants' profits from the scheme. (Indictment ¶ 11).

**B.    The Investigation**

The charges in the Indictment stem from an investigation that began in May 2006.  The investigation involved the use of, among other things, searches of various business and law offices, cooperating witnesses, physical surveillance, grand jury subpoenas for telephone and bank records, and judicially authorized wiretaps of three different telephones.

Electronic surveillance began on May 26, 2006 when the Honorable Naomi Reice Buchwald, United States District Judge, authorized the interception of communications on Alex Gorvits' cellphone.  Conversations were intercepted on Gorvits' phone until July 25, 2006.  (New Aff., Ex. 2 (Seifer Aff.) ¶ 15).  On August 18, 2006, the Honorable Stephen C. Robinson, United States District Judge, authorized the initial interception of communications on Igor Mishelevich's cellphone.  (New Aff., Ex. 2 (Seifer Aff.)).  Conversations were intercepted on Mishelevich's phone from August 21, 2006 until October 19, 2006.  Finally, communications were intercepted on Aleksander Lipkin's cellphone from November 9, 2006 through December 8, 2006 pursuant to another court-authorized wiretap.

Based upon the information learned during the course of the investigation, an initial indictment was unsealed on January 4, 2007, which charged 22 of the defendants with conspiracy to commit mortgage fraud and seven substantive counts of mail and

wire fraud in connection with specific mortgage and loan applications.  On that same date, law enforcement agents executed search warrants on four locations – two of AGA Capital's offices, the office of Rigonda Financial (another mortgage brokerage firm), and the law office of Alexander Rozenzaft.

On July 10, 2007, a superseding indictment was unsealed which added defendants Galina Zhigun, Garri Zhigun and Maryanne Furman.  The superseding indictment also added approximately 26 additional counts of mail, wire and/or bank fraud relating to a group of 10 rent-regulated apartments located at 243 West 98th Street, New York, New York.  At the same time, defendant Alex Kaplan, who was the closing attorney for the purchase and sale of those apartments, was arrested on a criminal complaint charging him with mail fraud in connection with the West 98th Street properties (the "Kaplan complaint").  (New Aff., Ex. 4 (Kaplan complaint)).  Kaplan was added as a defendant to the second superseding, which, as mentioned above, was filed on October 9, 2007.

### ARGUMENT

I.  **There Is No Basis To Suppress The Court-Authorized Wiretap Evidence In This Case.**

    A.  **Alternative Investigative Techniques Had Been Tried And Failed Prior To Interception Or Were Unavailable Or Unlikely To Succeed If Tried.**

Defendant Fuad Yakubov challenges the legality of the

6

court-authorized interceptions of wire communications on cellphone number (917) 628-4994 (the "Gorvits Cellphone") on the ground that alternative investigative techniques were not exhausted.[2]  This claim has no merit and should be denied.

### 1.  Applicable Law

Title 18, United States Code, Section 2518(1)(c) requires that an application for the interception of telephonic communications include "a full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous."  Similarly, Title 18, United States Code, Section 2518(3)(c) requires the judge reviewing a wiretap application to determine, as a condition of authorizing the wiretap, that "normal investigative procedures have been tried and have failed or reasonably appear to be unlikely to succeed if tried or to be too dangerous."

These requirements ensure that "wiretapping is not resorted to in situations where traditional investigative techniques would suffice to expose the crime."  United States v.

---

[2]    Although Yakubov notes, in Point I of his memorandum, that he has standing to challenge the interceptions over the Gorvits Cellphone and telephone number (917) 589-7000 (the "Mishelevich Cellphone"), he does not point to any deficiencies in the Government's applications for authorization to intercept telephone calls over the Mishelevich Cellphone, nor does he argue for their suppression.  Therefore, no cognizable issue has been raised for the Court and the Government does not address the Mishelevich Cellphone in this memorandum.

7

Kahn, 415 U.S. 143, 153 n.12 (1974).  However, as the Second

Circuit has explained:

> [T]he purpose of the statutory requirements
> of § 2518 is not to preclude the Government's
> resort to wiretapping until after all other
> possible means of investigation have been
> exhausted by investigative agents; rather,
> they only require that the agents inform the
> authorizing judicial officer of the nature
> and progress of the investigation and of the
> difficulties inherent in the use of normal
> law enforcement methods.

United States v. Torres, 901 F.2d 205, 231 (2d Cir. 1990)

(quoting United States v. Vazquez, 605 F.2d 1269, 1282 (2d Cir.

1979)); see also United States v. Trippe, 171 F. Supp. 2d 230,

236 (S.D.N.Y. 2001); United States v. Lombardo, 98 Cr. 1180

(DLC), 1999 WL 305096 at *5 (S.D.N.Y. May 14, 1999).  In other

words, the necessity requirement "'is far from an insurmountable

hurdle' and only requires that the Government demonstrate 'that

normal investigative techniques would prove difficult.'"  United

States v. Labate, 00 Cr. 632 (WHP), 2001 WL 533714, at *13

(S.D.N.Y. May 18, 2001) ((quoting United States v. Bellomo, 954

F. Supp. 630, 638 (S.D.N.Y. 1997)).

    Accordingly, Title III's "other investigative

procedures" sections do not establish a requirement "that any

particular investigative procedure [must] be exhausted before a

wiretap may be authorized.'"  United States v. Miller, 116 F.3d

641, 663 (2d Cir. 1997) (quoting United States v. Young, 822 F.2d

1234, 1237 (2d Cir. 1987)); see also United States v. Lilla, 699

8

F.2d 99, 104 (2d Cir. 1983) (same); <u>Labate</u>, 2001 WL 533714, at
*13 (same); <u>Lombardo</u>, 1999 WL 305096 at *5 (same); <u>United States</u>
v. <u>Stokes</u>, 96 Cr. 481 (SAS), 1996 WL 727400, at *5 (same).
Wiretapping was not meant to be a law enforcement tool of last
resort.

      The legislative history of the statute further makes
clear that Section 2518(1)(c) was not designed to force the
Government to exhaust all "other investigative procedures."  As
the Senate Report concerning the statute explained:

> Merely because a normal investigative
> technique is theoretically possible, it does
> not follow that it is likely.  What the
> provision envisions is that the showing be
> tested in a practical and commonsense
> fashion.

S. Rep. No. 1097, 90th Cong., 2d Sess., <u>reprinted in</u> 1968
U.S.C.C.A.N. 2190 (citations omitted).  Indeed, courts have
recognized that affidavits must be viewed in a "common sense and
realistic fashion".  <u>United States</u> v. <u>Ruggiero</u>, 726 F.2d 913, 924
(2d Cir. 1984); <u>see also</u> <u>Trippe</u>, 171 F. Supp. 2d at 236 ("the
application must be viewed in a practical and common sense manner
and need be only minimally adequate to support the issuing
judge's determination of necessity").

      In reviewing a wiretap application, the issuing judge's
determination that the necessity requirements were satisfied is
entitled to substantial deference.  The role of the reviewing
court is simply to "decide if the facts set forth in the

application were minimally adequate to support the determination that was made." Torres, 901 F.2d at 231.

### 2. Analysis

The challenged wiretap application easily satisfies the necessity requirements established by statute and the Second Circuit. The application both complies with the "full and complete statement" requirement of 18 U.S.C. § 2518(1)(c), and "inform[s] the authorizing judicial officer of the nature and progress of the investigation and of the difficulties inherent in the use of normal law enforcement methods." Torres, 901 F.2d at 231.

In an affidavit in support of the application to intercept telephone calls over the Gorvits Cellphone, FBI Special Agent J. Kevin O'Donnell set forth more than a legally-sufficient statement of the investigative procedures tried by law enforcement, as well as the limitations of those procedures in further developing the mortgage fraud investigation. (New Aff., Ex. 1 (O'Donnell Aff.), ¶ 38). First, in establishing probable cause to intercept the telephone line, Agent O'Donnell explained how the investigation had initially relied upon a confidential informant, "CW-1," in learning about the existence of the mortgage fraud scheme, and the role of target subject Alex Gorvits in the scheme. (Id. ¶ 17). As the affidavit made clear, CW-1 had direct contact with Gorvits, and provided him with

10

properties to purchase, as well as with possible straw buyers to use in the scheme.  CW-1 also outlined for law enforcement certain of the means and methods of the mortgage fraud scheme, including the use of inflated appraisals to obtain mortgages greater than the value of the underlying home, and the use of "show" checks when a down payment was required.  (Id. ¶ 17).

In addition, Agent O'Donnell explained that a second informant, "CW-2," had provided more general information about the identity of two additional target subjects, Alex Lipkin and Igor Mishelevich, as well as the mortgage brokerage, AGA Capital, where Gorvits, Lipkin and Mishelevich worked, and the different locations where AGA Capital did business.  (Id. ¶ 19).

Thereafter, Agent O'Donnell described for the authorizing judge the various documents he had reviewed relating to four properties that appeared to have been purchased as part of the target subjects' fraudulent scheme.  (Id. ¶¶ 20-24). Finally, Agent O'Donnell set forth the surveillance that had been conducted to date, including on two locations of AGA Capital.

After setting forth the information learned from these sources, Agent O'Donnell methodically explained why law enforcement believed that various investigative techniques, including the use of undercover law enforcement officers, confidential informants, physical surveillance, telephone toll records and pen registers, the grand jury, search warrants and

11

trash pulls "ha[d] been tried, or reasonably appear likely to fail if tried, or are likely to be too dangerous to employ" in furthering the goals of the investigation.  (Id. ¶ 38). Specifically, Agent O'Donnell explained the following to the authorizing judge:

- Introduction of undercover officers to the organization was unlikely to succeed because the subjects were part of a tightly-knit group.  The only opportunity to introduce an undercover was as a straw buyer, but that would have required the undercover to actually purchase a piece of property through fraudulent means – and would have left the Government responsible for repaying any losses to the appropriate financial institutions. As such, using undercover officers as straw buyers was not feasible on any scale, and such a tactic would not, in any event, offer any additional information about the identities of other co-conspirators or the scope of the fraud, as straw buyers are given the least access to the workings of the conspiracy.  (Id. ¶ 38(a)).

- Use of confidential informants was similarly unlikely to succeed, because of the closeness of the conspirators and the difficulty in introducing strangers into an ongoing criminal venture.  Agent O'Donnell explained that while CW-1 had provided valuable information to law enforcement, CW-1 was previously known to target subject Alex Gorvits, and was therefore trusted by Gorvits.  CW-1's utility was limited, however, because he only had access to Gorvits, and because he was in prison at the time the Government sought the application. (Id. ¶¶ 38(b),(c)).

- Physical surveillance, while useful to identify possible targets and the locations where they meet and do business, did not promise to be a profitable method of investigation; as with any fraud, direct evidence of the inner workings of the conspiracy, including the substance of meetings or conversations, could not be learned through surveillance.  (Id. ¶ 38(d)).

- Telephone toll records and pen registers were similarly only of limited utility. Although such records can show contact between targets, they can do little else, and cannot establish the identities of other targets, or offer substantive evidence of the target crimes. (<u>Id.</u> ¶ 38(e)).

- Use of the federal grand jury was also not considered a fruitful investigative technique, in that the target subjects would likely invoke their Fifth Amendment rights, and grants of immunity to such witnesses would thwart the public policy interest in prosecuting those responsible for crimes. Although grand jury subpoenas had been issued to lending institutions for mortgage documents, Agent O'Donnell explained that serving subpoenas on the targets could compromise the investigation by alerting them to law enforcement's interest in their activities. (<u>Id.</u> ¶ 38(f)).

- Finally, techniques directed at particular locations, such as search warrants or trash pulls, were deemed unlikely to succeed, as the locations where documents are stored had not yet been identified at the time of the application.[3] (<u>Id.</u> ¶ 38(g)).

As evidence of the limited progress of the investigation and the difficulties inherent in relying on traditional methods of investigation, as of the time the first wire intercepts began on May 26, 2006, law enforcement had identified only three participants – Alex Gorvits, Alex Lipkin and Igor Mishelevich – out of approximately 27 members of the conspiracy ultimately charged in this case; identified only

_____

[3]    Yakubov argues in Point II of his memorandum that Agent O'Donnell's affidavit sets forth only one investigative technique – physical surveillance. (Yakubov Mem. at 9). As the preceding discussion of the affidavit amply demonstrates, this is not so.

approximately four fraudulent purchases of real estate; and had

not yet fully identified the means and methods of the fraudulent

mortgage application scheme.  Indeed, only with the assistance of

electronic surveillance did law enforcement ultimately learn the

identities of numerous other co-conspirators, the scope and

extent of the fraudulent mortgage application scheme, including

the involvement of certain real estate attorneys, appraisers, and

bank representatives, and the locations of certain places where

fraudulent deals were closed.

In sum, Agent O'Donnell's affidavit provided detailed

information to the authorizing judge regarding the use of

traditional investigative methods, the progress made with regard

to those methods, and the difficulties of employing them to

accomplish fully the goals of the investigation.  No more was

required under the law.  See, e.g., United States v. Miller, 116

F.3d at 663 (articulating the standard for establishing

necessity); United States v. Torres, 901 F.2d at 231 (same).

Yakubov claims that suppression of the wire intercepts

on the Gorvits Cellphone is warranted because law enforcement did

not exhaust the use of undercover officers or confidential

informants in its investigation, among other things.  (Yakubov

Mem. at 10-11).  These claims fail as a matter of law and fact.

First, the law makes clear that the Government is not

required to exhaust any particular investigative technique before

14

seeking court authorization to wiretap.  See, e.g., United States
v. Miller, 116 F.3d at 663; United States v. Lilla, 699 F.2d at
104; Labate, 2001 WL 533714, at *13; Lombardo, 1999 WL 305096 at
*5.  Accordingly, even if the Government theoretically could have
made more use of undercovers or informants in the investigation,
it was not required to do so.

        Second, Yakubov's argument is are belied by the facts
of the investigation.  As Agent O'Donnell's affidavit made clear,
using undercover officers as straw buyers was simply not a
practicable method of investigating a large-scale, closely-knit
ring of mortgage brokers and their associates.  First, given the
expense and the risk of loss associated with employing undercover
officers as straw buyers, this method of investigation was not
feasible on any scale.[4]  And even if one undercover officer had
posed as a straw buyer, there would have been limited utility to
this investigative method.  As Agent O'Donnell explained, because
straw buyers were the least important and least trusted members
of the conspiracy, any undercover officer posing as a straw buyer

---

        [4]    Yakubov disputes the notion that cost should play a
role in law enforcement's choice of investigative techniques.
But purchasing properties with inflated mortgages is extremely
risky: either the Government must make monthly mortgage payments
or, if the properties are permitted to go into foreclosure, repay
the lender the difference between the value of the mortgages and
the underlying value of the property.  If property values go down
– as they have – then the Government would be out even more
money.  The law simply does not require the Government to assume
this much – or any – financial risk in order to exhaust a
particular investigative technique.

15

was highly unlikely to have been introduced to any of the other
conspirators who played a role in the mortgage fraud scheme, nor
would an undercover officer have been given access to information
about the organization's financing or the disposition of the
proceeds of the crime.

Yakubov also disputes Agent O'Donnell's explanation
that confidential informants were not likely to fully reveal the
scope of the conspirators' scheme.  (Yakubov Mem. at 11, 13).  In
support of this point, Yakubov repeatedly claims that the
conspiracy was not closely-knit or difficult to penetrate because
the conspirators allegedly welcomed anyone with a sufficiently
high credit score to participate in the scheme.  Yakubov's claim
fails on several fronts.  First, it is highly speculative.  At
the time the application was written, there was no evidence that
the conspiracy was wide open to anyone with a good credit score;
rather, the evidence was that the co-conspirators recruited straw
buyers who were willing to be part of the scheme and paid them a
substantial fee to participate.  These facts do not suggest that
the conspirators indiscriminately welcomed strangers to their
scheme; indeed, it suggests the opposite.  Second, this claim,
even if true, misses the larger point: as explained above, straw
buyers were simply not in a position to learn the identities of
the players, the mechanics, or the details of the mortgage fraud
scheme.  As the wiretapping ultimately made clear, the mortgage

16

brokers controlled the critical aspects of the mortgage
application process – the selection of the property, negotiations
with the "investor" and the appraiser over the inflated value of
the home, and the submission of paperwork with false or
misleading information to the lenders.  The straw buyers were
required to come to the closing and sign papers – and sometimes
they were not even required to do that – and nothing more.
Accordingly, even assuming that the conspirators would have
permitted confidential informants posing as straw buyers to join
the scheme, this investigative method was not likely to meet law
enforcement's larger objectives in understanding the full scope
of the criminal enterprise.

As a final point, Yakubov claims that the Government
did not need wiretapping authority because Gorvits was still
willing to work with CW-1 while CW-1 was incarcerated.  (Yakubov
Mem. at 16-17).  But continuing to utilize CW-1 would not have
been of much use in achieving the investigation's larger goals:
as the affidavit made abundantly clear, CW-1 only knew Gorvits,
and he had already provided the authorities with ample evidence
that Gorvits was committing crimes.  And CW-1 was simply not in a
position to do anything proactive from prison.

Finally, Yakubov claims that wiretapping was
unnecessary to achieve the Government's objectives because a host
of other investigative means – including surveillance and

17

telephone toll records – were successful in revealing the criminal organization.  (Yakubov Mem. at 17).  Again, these arguments simply do not pass muster.  As Agent O'Donnell's affidavit explained in great detail, surveillance and telephone toll records can show a connection between certain people and certain places – but they cannot reveal the substance of conversations and meetings, which are critical importance in a fraud case involving over two dozen people.  Because Gorvits was a mortgage broker, he could be expected to have contact with numerous real estate professionals, bankers, and customers, as well as friends and family, many of whom had no connection to his illegal activities.  As such, these methods of investigation, while successful for their limited purposes, could never alone have uncovered the full scope and extent of the fraudulent mortgage scheme.

In any event, as explained above, the law simply does not require law enforcement to exhaust any one avenue of investigation before implementing electronic surveillance.  Rather, the Second Circuit has held that the Government must explain the investigation's progress to date, and outline the difficulties in using other traditional methods of investigation.  CITE.  Agent O'Donnell adequately complied with this directive.

Yakubov suggests that United States v. Lilla, 699 F.2d 99 (2d Cir. 1983), supports his motion to suppress.  It does not.

18

While the affidavit that was found wanting in <u>Lilla</u> was entirely "bare bones," in that it did "not reveal what, if any, investigative techniques were attempted prior to the wiretap request," <u>Lilla</u>, 699 F.2d at 104, the same certainly cannot be said of this case.  Moreover, as a factual matter, it appeared in <u>Lilla</u> as if the target operated openly, without fear of detection, in what the Court deemed a "small-time" narcotics case.  A twenty-five defendant fraud conspiracy involving mortgage brokers, appraisers, and bank representatives, by contrast, bears no relation to a "small-time," relatively uncomplicated narcotics case.  Thus, this case simply cannot be compared to <u>Lilla</u>.

        In sum, the authorizing judge's conclusion that the Government had made adequate use of traditional investigative techniques, and that less intrusive investigative procedures would not have been sufficient to expose the full scope of the mortgage fraud scheme, was fully supported by the contents of Agent O'Donnell's affidavit at issue.  These findings merit the substantial deference to which they are entitled.  <u>See</u>, <u>e.g.</u>, <u>United States</u> v. <u>Wilkinson</u>, 754 F.2d 1427, 1433 (2d Cir. 1985); <u>Ruggiero</u>, 726 F.2d at 924; <u>Trippe</u>, 171 F. Supp. 2d at 236.[5]

---

        [5]    As a final point, Yakubov alleges that this Court should order a <u>Franks</u> hearing to determine whether Agent O'Donnell deliberately lied in his affidavit when he asserted that various alternative investigative methods were unlikely to succeed.  (Yakubov Mem. at 19-20).  In support of this point,

## II.  **Zhigun's Motion to Suppress Evidence Seized Pursuant to a Court-Authorized Search Warrant Should Be Denied**

Defendant Galina Zhigun moves to suppress certain evidence that was seized pursuant to a court-authorized search warrant on the ground that there was no probable cause to search the AGA Capital Office located on the first floor of 2729 Coney Island Avenue, Brooklyn New York.  This argument is meritless, and the motion should be denied.

### A.  **Background**

On January 3, 2007, the Government obtained warrants to search four locations – each of AGA Capital's two offices, the office of Rigonda Financial (another mortgage brokerage firm), and the law office of Alexander Rozenzaft.[6]  The warrants were executed at the time that the majority of the defendants were arrested on January 4, 2007.  The search warrants were supported by another affidavit signed by FBI Special Agent J. Kevin O'Donnell, which was approximately 40 pages long and summarized the Government's investigation to date by referencing specific fraudulent loan applications and other documents that were submitted by the defendants from the search locations; physical

---

Yakubov does not point to a single alleged false statement in the affidavit; rather, he seeks a <u>Franks</u> hearing based exclusively on his disagreement with Agent O'Donnell's necessity analysis.  On these facts, no hearing is warranted, and Yakubov's final claim should be summarily denied.

[6]     The search warrants were signed by Magistrate Judge Cheryl L. Pollack in the Eastern District of New York.

surveillance of the defendants and the search locations; recordings of telephone conversations that were intercepted pursuant to court authorized wiretaps; information provided by a cooperating witness; and consensually-monitored recordings involving defendant Igor Mishelevich.  (New Aff., Ex. 3 (Search Warrant Aff.)).  The affidavit also noted that defendants Aleksander Lipkin, Igor Mishelevich, Alex Gorvits, Marina Dubin, Igor Buzakher, Joseph Paperny, Daniel Mikhlin, John Gelin, Franswa Ligon, Fuad Yakubov, Ricardo Acosta, Eric Callahan, Douglas Ellison, Oleg Anokhin, David Neustein, Tomer Sinai, Nathaniel Kessman, Carl Carr, John Ciafolo, Lucianne Morello, Faina Petrovskaya, Mariya Badyuk,and Marina Klotsman had recently been charged in Indictment 06 Cr. 1179 with participating in a mortgage fraud scheme.  (Id. ¶ 5.)

The search warrant affidavit outlined the mortgage fraud scheme perpetrated by the defendants.  Specifically, the affidavit explained that from approximately 2004 through December 2006, the defendants conspired to defraud various banks and lending institutions (the "lenders") by submitting applications and supporting documentation for mortgages and loans that contained materially false and misleading information.  (Id. ¶ 4(a)).  Lipkin, Mishelevich, Gorvits and Buzakher acted as mortgage brokers who worked at various times in AGA Capital's two offices and the office of Rigonda Financial.  (Id. ¶ 4(b)).

Among other things, the defendants and their co-conspirators fraudulently improved loan applicants' credit worthiness by falsifying certain personal and financial information in documents that were submitted to the lenders.  In support of these false and misleading representations, the defendants also created fake documents, such as bank statements and proof of income, that lenders relied upon to verify statements in the loan applications. (Id. ¶ 4(e)).  The defendants submitted these fraudulent documents to the lenders from AGA Capital's two offices and the office of Rigonda Financial.  (Id.).   In total, from 2004 through 2007, the defendants and their associates brokered more than one thousand home mortgages and home equity loans, with a total face value of at least two hundred million dollars.  (Aff. ¶ 4(a)).

     With respect to the AGA Capital Office located on the first floor of 2729 Coney Island Avenue, Brooklyn New York ("PREMISES 2"), the affidavit provided a detailed description of the interior layout of the office space including desks and computers where documents and files could reasonable be expected to be stored.  (Id. ¶ 20.)  The affidavit further stated that defendants Aleksander Lipkin and Alex Gorvits worked at PREMISES 2 where they "direct[ed] the preparation and submission of fraudulent mortgage and loan applications."  Defendant Lucianne Morello also worked at PREMISES 2, where she "assemble[d] and

submit[ted] mortgage applications to various lenders on behalf of Gorvits and Lipkin." (Id. ¶ 23.)  This information was based upon physical surveillance, intercepted telephone conversations, and bank records and other documents. (Id.)  Specifically, the affidavit identified three fraudulent applications for mortgages that were submitted to lenders in September, October and December 2005 from PREMISES 2, by brokers Igor Buzakher and Alex Lipkin.[7] (Id. ¶ 24).  The affidavit further specified physical surveillance and wire intercepts from May through December 2006 that confirmed that Aleksander Lipkin and Alex Gorvits continued to work for AGA Capital and operated out of PREMISES 2.  (Id. ¶ 23).  Other intercepted telephone conversations revealed that Lipkin and others continued to engage in mortgage fraud activities through December 2006.  (Id. ¶¶ 12(g),(h) and (i), 28.)

### B.  Applicable Law

A defendant who argues that a warrant was issued on less than probable cause faces a very heavy burden.  Rivera v. United States,  928 F.2d 592, 602 (2d Cir.1991).  Once a warrant

---

[7]    Zhigun erroneously contends that these three mortgages "were funded in September-December 2005, which means the forms containing the address of the interviewers were filled out months before any funding."  (Zhigun Mem. at 12).  In fact, as the loan files provided in discovery make clear, these applications were submitted less than one month before the loans were funded. In any event, it is reasonable to expect that these applications, as well as supporting documentation, would be retained by AGA Capital through the date of funding and long after.

has been issued, the magistrate judge's finding of probable cause
is entitled to substantial deference by the reviewing court.
United States v. Singh, 390 F.3d 168, 181 (2d Cir. 2004); United
States v. Rosa, 11 F.3d 315, 326 (2d Cir.1993).  The reviewing
court is not to review the issue of probable cause *de novo*."
Illinois v. Gates, 462 U.S. 213, 236 (1983); Rosa, 11 F.3d at
326.  In reviewing a magistrate's probable cause determination, a
reviewing court is to "ensure that the magistrate had a
substantial basis for . . . [concluding] that probable cause
existed," based on a totality of the circumstances.  Gates, 462
U.S. at 214, 233 (internal quotations and citations omitted).
"Any doubt regarding the existence of probable cause must be
resolved in favor of upholding the warrant." United States v.
Salameh, 152 F.3d 88, 113 (2d Cir. 1998); see also Singh, 390
F.3d at 181; Rosa, 11 F.3d at 326.

        The probable cause standard is a "practical,
nontechnical conception" based on "factual and practical
considerations of everyday life."  Gates, 462 U.S. at 232. "In
determining whether a search warrant is supported by probable
cause, a flexible, totality-of-the-circumstances standard is
employed."  United States v. Feliz-Cordero, 859 F.2d 250, 252 (2d
Cir. 1988).  A search warrant affidavit need only establish "a
*fair probability* that contraband or evidence of a crime will be
found in a particular place."  Gates, 462 U.S. at 238 (emphasis

24

added); <u>see</u> <u>also</u> <u>United States</u> v. <u>Martin</u>, 426 F.3d 83, 86 (2d Cir. 2005).

In assessing a claim of staleness, "the passage of time [alone] is not controlling and is but one factor to be considered, along with the kind of property sought . . . the nature of the criminal activity . . . [and] the length of the criminal activity . . . ." <u>Singh</u>, 390 F.3d at 181-82. "Where a supporting affidavit presents a picture of continuing conduct as opposed to an isolated instance of wrongdoing . . . the passage of time between the last described act and the presentation of the application become less significant." <u>United States</u> v. <u>Diaz</u>, 176 F.3d 52, 109 (2d Cir.1999).

In addition, even if a reviewing court later finds that a search warrant affidavit failed to establish probable cause, the evidence is admissible if the seizing agents acted in good faith. <u>United States</u> v. <u>Leon</u>, 468 U.S. 897, 923 (1984). The test for ascertaining whether the agents acted in good faith requires assessment of "whether a reasonably well trained officer would have known that the search was illegal despite the magistrate's authorization." <u>Id.</u> at 923 n.23. The good faith exception is inapplicable, however, to situations:

> (1) where the issuing magistrate has been knowingly misled; (2) where the issuing magistrate wholly abandoned his or her judicial role; (3) where the application is so lacking in indicia of probable cause as to render reliance upon it unreasonable; and

> > (4) where the warrant is so facially
> > deficient that reliance upon it is
> > unreasonable.

United States v. Moore, 968 F.2d 216, 222 (2d Cir. 1992) (citing

Leon, 468 U.S. at 923).

**C.    Analysis**

**1.    There Was Probable Cause to Search PREMISES 2**

The search warrant affidavit provided a substantial

basis for the magistrate judge to conclude that there was

probable cause to believe that documents and records used to

perpetrate the defendants' mortgage fraud scheme would be found

at PREMISES 2.  As described above in greater detail, the

affidavit established that Alex Lipkin and Alex Gorvits, among

other people, were mortgage brokers who worked for AGA Capital.

The affidavit further established that they submitted

applications and other documents to lenders from PREMISES 2 and

AGA Capital's nearby satellite office ("PREMISES 3").   The

affidavit further specified specific false documents that were

submitted from PREMISES 2 and could reasonably be expected to be

maintained at PREMISES 2.  Finally, the affidavit established

that the mortgage fraud scheme was ongoing at the time that the

warrant was issued, and that Lipkin, in particular, was

continuing to engage in fraudulent activities.

Zhigun mischaracterizes the search warrant affidavit by

arguing that the warrant was primarily based upon the fact that

Lipkin and Gorvits were seen "walking in and out of the PREMISES 2 six or seven months earlier."[8]  (Zhigun Mem. at 15). Lipkin and Gorvits were not mere passersby or random customers of AGA Capital.  They were mortgage brokers who worked for AGA Capital for several years in both PREMISES 2 and PREMISES 3. They were assisted in preparing and submitting fraudulent documents to lenders by other AGA Capital employees, such as Lucianne Morello.  Furthermore, although Zhigun tries to distinguish PREMISES 2 from PREMISES 3, the affidavit explained that AGA Capital had recently "expanded from PREMISES 2 to PREMISES 3," (New Aff., Ex. 3 (Search Warrant Aff.), ¶ 21), and that the receptionist at PREMISES 3 confirmed that PREMISES 3 was "affiliated with" PREMISES 2.  (Id. ¶ 23(f)).  Thus, it was highly probable that documents concerning Lipkin's and Gorvits' business dealings, including their fraudulent activities, would be retained by AGA Capital inside of PREMISES 2.

---

        [8]    Zhigun also suggests that the affidavit is insufficient because it "presents no information that Ms. Zhigun was involved in any criminal activity." (Zhigun Mem. at 10-11.)  This argument misses the mark.  It is well established that, "[s]earch warrants are not directed at persons; they authorize the search of 'place[s]' and the seizure of 'things,' and as a constitutional matter they need not even name the person from whom the things will be seized . . . . The critical element in a reasonable search is not that the owner of the property is suspected of crime but that there is reasonable cause to believe that the specific 'things' to be searched for and seized are located on the property to which entry is sought.  Zurcher v. Stanford Daily, 436 U.S. 547, 554-55 (1978) (quoting United States v. Kahn, 415 U.S. 143, 155 n. 15 (1974)).

2.    **The Search Warrant Was Not Based Upon Stale
      Information**

Zhigun also contends that the evidence described in the affidavit was too old to establish probable cause for a search of PREMISES 2. This argument, however, takes an unduly restrictive view of the contents of the affidavit and ignores the "factual and practical considerations of everyday life." Illinois v. Gates, 462 U.S. 213, 232 (1983). The search warrant affidavit provided a substantial basis to conclude that evidence and instrumentalities of the mortgage fraud scheme would be found in the office and computer files located at PREMISES 2.

The search warrant affidavit explained that the defendants and their co-conspirators had been engaged in a large-scale scheme to defraud various banks and lending institutions over a period of several years. The affidavit further established that the scheme was ongoing up to the time of the search, and that the scheme had been organized, supervised and carried out by employees of AGA Capital, a mortgage brokerage with its primary office located at PREMISES 2. (New. Aff., Exhibit 3 (Search Warrant Aff.), ¶¶ 4, 19-23, 28). Moreover, the affidavit specified that documents and records used in the commission of the fraud had originated from PREMISES 2 and another affiliated AGA office. "The items sought in the affidavit (bank records, computer equipment, etc.) include voluminous items usually stored in secure locations, under the

control of the owner, for long periods of time.  Given the time frame of the fraud alleged, and the likelihood that the records sought would be retained, . . . the probable cause determination here was not based on stale information." United States v. Russo, 483 F.Supp.2d 381 (S.D.N.Y. 2007).

In United States v. Singh, the defendant appealed the denial of his motion to suppress based on a claim of staleness. Singh had been charged with "white-collar" crimes (health care fraud and related offenses), arising out of the operation of his medical practice.  Singh, 390 F.3d at 179.  During the investigation of Singh, the Government sought a series of search warrants for his home and several offices and then seized a variety of incriminating evidence related to his fraudulent billing scheme.  Id. at 178.

The affidavits for those search warrants outlined the Government's investigation into Singh's fraudulent scheme and relied heavily on information provided by one of Singh's former employees, an Office Manager named Bruce Storm. In the affidavit, the Government included Storm's description of Singh's fraudulent scheme; however, Storm had left Singh's employ more than twenty months prior to the application for the search warrant and had no more current information.  Id. at 179-180.  The defense therefore argued that "since all of the information provided was over a year and a half old, it was stale and cannot provide adequate

29

probable cause to search Dr. Singh's offices." Id. at 181.

This Second Circuit flatly rejected Singh's argument, finding instead that:

> While a period of more than twenty months elapsed between Storm's last date of employment in the [Medical] Practice and the search warrant application, "when the supporting facts present a picture of continuing conduct or an ongoing activity, . . . the passage of time between the last described act and the presentation of evidence becomes less significant."

Id. at 181 (quoting United States v. Ortiz, 143 F.3d 728, 732-33 (2d Cir. 1998)). Indeed, in assessing staleness claims, the Singh panel urged district courts to consider "the kind of property sought," and the "length" and "nature of the criminal activity." Id. at 181-82.

In this case, as in Singh, there was clearly probable cause to believe that the "kind of property sought" from PREMISES 2 would still be there. The Singh panel found that the defendant's medical records "made and retained in the business office were of the type that would necessarily be kept over a period of years and would reasonably be found in the business office of any medical practice." Singh, 390 F.3d at 182; see also United States v. Hershenow, 680 F.2d 847, 854 (1st Cir. 1982). Similarly mortgage brokers, like doctors, lawyers or other licensed and regulated professionals, keep files for each of their clients or properties and would be expected to retain those

30

files for many years, even after the matter is closed.  The
Magistrate Judge who signed the warrant in this case was entitled
to consider these realities by "go[ing] beyond the averred facts
and draw[ing] upon common sense in making reasonable inferences
from those facts."  United States v. Hershenow, 680 F.2d at 852.

Finally, the "length" and the "nature of the criminal
activity" outlined in the affidavit, Singh, 390 F.3d at 181-82,
further confirms that the information contained in the affidavit
was not stale and was sufficient to support the magistrate's
finding of probable cause. The allegations in the affidavit
supported a finding that the defendants had been engaged in
criminal activity for a period of years, from at least as early
as 2004 through December 2006, and for a substantial portion of
that time they operated out of PREMISES 2.  Indeed, by
definition, the defendants' crime – mortgage fraud – took months,
to complete due to delays inherent in the processing of
applications and the funding of loans by the various lenders.
Thus, the defendant mortgage brokers would necessarily have had
to retain loan files in their offices and maintain contact with
lenders, borrowers, appraisers, title companies and other related
parties over a prolonged period of time in furtherance of the
conspiracy.

### 3.  The Agents Executed the Warrant in Good Faith

In any event, assuming *arguendo* that the information in

31

the affidavit was found to be stale or that the warrant was issued without sufficient probable cause to search PREMISES 2, this is a classic case for application of the "good faith" exception.

In United States v. Leon, 468 U.S. 897, 920 (1984), the Supreme Court held that evidence seized pursuant to a search warrant should not be suppressed when the seizing agent "acting with objective good faith has obtained a search warrant from a judge or magistrate and acted within its scope." Leon, 468 U.S. at 920. The reason for the Leon "good faith" exception is that "an officer cannot be expected to question the magistrate's probable-cause determination." Id. at 921.

In this case, it is absurd to suggest that, although a Magistrate found that the affidavit set forth probable cause, the seizing agents should have realized that it was lacking. See United States v. Jasorka, 153 F.3d 58 (2d Cir. 1998); United States v. Tisdale, 195 F.3d 70 (2d Cir. 1999). Notably, Zhigun does not contend that the affidavit failed to set forth probable cause for searching any of the other three locations for which warrants were issued. Thus, Zhigun cannot and does not argue that the warrant was "so facially deficient that reliance upon it is unreasonable." Moore, 968 F.2d at 222. Nor does Zhigun argue that "the issuing magistrate was knowingly misled" in any way or that ere the issuing magistrate wholly abandoned his judicial

role in issuing the warrant.  Id.  Because the seizing agents
acted in good faith in executing the warrant, the seized evidence
should not be suppressed.

## III.    THE DEFENDANTS' REQUESTS FOR A BILL OF PARTICULARS SHOULD BE DENIED

Several of the defendants (Zhigun, Kaplan, and Yakubov)
seek an order from the Court directing the Government to provide
them with a bill of particulars for the following items: (1) the
identity of unindicted co-conspirators and "other persons"
referred to in the Indictment; (2) the specific locations as to
where overt acts may have been committed; (3) the specific "false
information" or "material omissions" used to procure the
mortgages and other loans; and (4) the identities of properties
for which fraudulent applications were submitted to lenders.

The moving defendants however, presently possess more
than sufficient information to understand the charges against
them, to prepare a defense, to avoid unfair surprise at trial,
and to protect themselves against double jeopardy.  As they are
entitled to no more, their requests for a bill of particulars
should be denied.

### A.    Applicable Law

The proper scope and function of a bill of particulars
is to furnish facts supplemental to those contained in the
indictment that are necessary to apprise the defendant of the
charges against him with sufficient precision so as to enable him

to prepare his defense, to avoid unfair surprise at trial, and to preclude a second prosecution for the same offense.  Fed. R. Crim. P. 7(f); United States v. Torres, 901 F.2d 205, 234 (2d Cir. 1990); United States v. Bortnovsky, 820 F.2d 572, 574 (2d Cir. 1987); United States v. Panza, 750 F.2d 1141, 1148 (2d Cir. 1984).  "Those are the only legitimate purposes of a bill of particulars." United States v. Sindone, 2002 WL 48604, at *1 (S.D.N.Y. Jan. 14, 2002).  "A bill of particulars should be required only where the charges of the indictment are so general that they do not advise defendant of the specific acts of which he is accused." Torres, 901 F.2d at 234.  See United States v. Earls, 2004 WL 350725, at *4 (S.D.N.Y. Feb. 25, 2004). Accordingly, the ultimate test is whether the information sought is necessary, not whether it is helpful.  See Earls, 2004 WL 350725, at *4; United States v. Lauerson, 1999 WL 440619, at *3 (S.D.N.Y. June 28, 1999).

     If the information the defendant seeks "is provided in the indictment or in some acceptable alternate form," such as discovery, no bill of particulars is required.  Bortnovsky, 820 F.2d at 572; United States v. Spy Factory, 960 F. Supp. 684, 690-91 (S.D.N.Y. 1997).  The vehicle of a bill of particulars serves to inform a defendant of the nature of the charge, when he is otherwise insufficiently informed, and must not to be misused to compel disclosure of how much the Government can prove, nor to

foreclose the Government from using proof it may develop as the trial approaches. See United States v. Henry, 861 F. Supp. 1190, 1197 (S.D.N.Y. 1994). "[A] bill of particulars is not a general investigative tool, a discovery device, or a means to compel the government to disclose evidence or witnesses to be offered prior to trial." United States v. Nunez, 2001 WL 91708, at *5 (S.D.N.Y. Feb. 1, 2001); accord Earls, 2004 WL 350725, at *5. A bill of particulars should not be used to learn evidentiary detail, see Torres, 901 F.2d at 234, the precise manner in which the charged crimes were committed, see United States v. Andrews, 381 F.2d 377, 377-78 (2d Cir. 1967), the manner in which the Government will prove the charges, see United States v. Leonelli, 428 F. Supp. 880, 882 (S.D.N.Y. 1977), all the overt acts in furtherance of a conspiracy, see United States v. Carroll, 510 F.2d 507, 509 (2d Cir. 1975), or particular acts that a particular defendant participated in, had knowledge of, or for which he is being held responsible, see United States v. Jimenez, 824 F. Supp. 351, 363 (S.D.N.Y. 1993). For example, "the government is not required to prove how or when the conspiracy was formed or how or when defendants joined the conspiracy." United States v. Pacheco, 902 F. Supp. 469, 474 (S.D.N.Y. 1995).

There are several reasons for this restricted use of a bill of particulars. First, the Government is not required to provide information tantamount to an itemized preview of its

proof because of the very real danger in criminal cases that the defendants will tailor their testimony to explain away the Government's pre-disclosed case.   See United States v. Cimino, 31 F.R.D. 277, 279 (S.D.N.Y. 1962).   Second, detailed inquiries into the Government's case would unduly restrict the Government in presenting its proof at trial.   See, e.g., Jimenez, 824 F. Supp. at 363; United States v. Goldman, 439 F. Supp. 352 (S.D.N.Y. 1977).   Courts in this District have consistently held that, because a bill of particulars "confines the Government's proof to particulars furnished, requests for a bill of particulars should not be granted where the consequence would be to restrict unduly the Government's ability to present its case." United States v. Feola, 651 F. Supp. 1068, 1132 (S.D.N.Y. 1987).   In sum, demands for "whens" and "wheres" and "with whoms" relating to the formation of and participation in schemes and conspiracies routinely have been denied.   Torres, 901 F.2d at 233-34; United States v. Colson, 662 F.2d 1389, 1391 (11th Cir. 1981) (motion for bill of particulars requesting identities of unnamed co-conspirators, dates and locations of conspiratorial acts, and other detailed information properly denied); United States v. Wilson, 565 F. Supp. 1416, 1438-39 (S.D.N.Y. 1983).   If a defendant has been given adequate notice of the charges against him in the indictment or in some alternative form, the Government need not disclose additional details about the case.   See

36

<u>Bortnovsky</u>, 820 F.2d at 574; <u>United States</u> v. <u>Payden</u>, 613 F.
Supp. 800, 816 (S.D.N.Y. 1985).

"Discovery in criminal proceedings is not comparable to
discovery in civil [proceedings] because of the nature of the
issues, the danger of intimidation of witnesses, and the greater
danger of perjury and subornation of perjury." <u>United States</u> v.
<u>Malinsky</u>, 19 F.R.D. 426, 428 (S.D.N.Y. 1956).  As a court in this
District has observed,

> The stakes in a criminal case are high, and
> temptations of perjury, subornation and
> intimidation are ever present.  Accordingly,
> the Government is not required to turn over
> information that will permit a defendant to
> preview the government's case and tempt him
> to tailor proof to explain it away, or see to
> it that the government's proof is not
> presented.

<u>Sindone</u>, 2002 WL 48604, at *1 (citing <u>United States</u> v. <u>Simon</u>, 30
F.R.D. 53, 55 (S.D.N.Y. 1962); <u>Cimino</u>, 31 F.R.D. 277, 279
(S.D.N.Y. 1962)).

## B.  Discussion

In light of the clear legal principles that limit the
defendants' right to investigate the Government's proof and legal
theories before trial, the defendants' requests for a bill of
particulars should be denied.  The Indictment, the complaint
filed against defendant Alexander Kaplan, and the extensive
discovery materials — including seven months of Title III
affidavits, search warrant affidavits, hundreds of recorded

37

conversations, detailed discovery letters and indices, and other records — all provide the defendants with detailed information relating to the conduct with which they are charged.

In addition to the specific and detailed information contained in the Indictment, the Government has provided and made available to the defendants substantial discovery. That discovery includes, among other things: (1) approximately 5 detailed Title III affidavits, and associated periodic reports, which contain descriptions of many of the conversations and transactions that are charged as overt acts in the indictment; (2) search warrants, which summarize in detail elements of the Government's evidence regarding some of the criminal conduct in this case; (3) consensually-recorded conversations with Igor Mishelevich and Alex Gorvits made by cooperating witnesses; (4) reports reflecting statements made to the FBI post-arrest; (5) various documents, including loan files for specific properties that the government alleges to have been the subject of fraudulent loan applications, phone records, bank records, and items seized from searches; (6) discovery letters containing lists of the specific properties for which loan files have been provided; (7) an index identifying for each defendant the specific recorded telephone conversations on which he or she was intercepted; and (8) the Kaplan complaint, which relates to the charges contained in Counts 9 through 35 of the Indictment.

Bearing in mind that the test for a bill of particulars is not whether the information sought is helpful to the defense, but whether it is necessary, the defendants' motion for a bill of particulars should be denied.  A review of the defendants' demands make clear that in large part they seek a road map to the prosecution's case.  A review of the governing decisions makes clear that they are not entitled to it.  The Government intends to make in limine motions relating to 404(b) evidence (if any), the admissibility of co-conspirator statements, and other evidentiary issues.  Thus, as detailed below, well in advance of trial the defense will be receiving additional ample information about the Government's proof, including many of the particulars that they seek now.   The defendants are entitled to no more in the way of a preview of the case. The defendants "are not entitled to know . . . the means by which it is claimed they performed acts in furtherance of the conspiracy, nor the evidence which the government intends to adduce to prove their criminal acts."  Johnson, 21 F. Supp.2d at 339 (quoting United States v. Persico, 621 F. Supp. 842, 868 (S.D.N.Y. 1985)).

For example, defendant Zhigun asks the Government to identify unindicted co-conspirators and other unnamed persons referred to in the Indictment.  However, Zhigun does not provide any reasonable and specific explanation as to why immediate

39

disclosure is required. See United States v. Solomonyan, 451
F.Supp.2d 626, 641 (S.D.N.Y. 2006) ("The question is whether the
names of unindicted co-conspirators are necessary to prepare a
defense and avoid surprise.") (emphasis added).   Indeed, in the
Indictment itself the defendants have been given "the names of
key members of the enterprise charged," as well as "a detailed
description of how the enterprise and its members operated,"
details that have been held to obviate the need for a bill of
particulars.  United States v. Conesa, 899 F. Supp. 172, 176
(S.D.N.Y. 1995).  Additional co-conspirators are identified in
the Title III applications and periodic reports.  With that
information, the defendants cannot credibly claim that they must
know the identities of any other co-conspirators in order to
understand the charges against them.  Further, "to the extent
that the defendants' requests for the identities of unnamed
co-conspirators and victims are really requests for a list of the
witnesses whom the Government intends to call at trial," — in
other words, a veiled attempt to discern who is cooperating with
the Government — "they are not entitled to this list before trial
without a specific showing of need, which has not been
established in this case." United States v. Kevin, No. 97 Cr.
763 (JGK), 1999 WL 194749, at *12 (S.D.N.Y. Apr. 7, 1999).

     Similarly specious is Zhigun's request for the
Government to identify the specific locations where events in

40

furtherance of the conspiracy are alleged to have taken place.
The Indictment, search warrants, Title III affidavits and the
Kaplan complaint provide the defendants with detailed information
concerning the various offices and other locations where the
fraud scheme was principally committed.  For example, Zhigun
requests that the Government identify "the specific location in
Brooklyn, New York where it is alleged that defendant Mishelevich
. . . submitted the loan application alleged in" paragraph 27(a)
of the Indictment.  However, the Indictment itself specifies that
Mishelevich worked as a mortgage broker for AGA Capital in
Brooklyn, New York.  (Indictment ¶¶ 2, 14).  The Title III
affidavits similarly identify Mishelevich as a broker who worked
in AGA Capital's offices.  (New Aff., Ex. 2 (Seifer Aff.), ¶¶
18(d), 22, 26).  Furthermore, a review of the loan file produced
in discovery for the mortgage at issue in this overt act (which
the Title III affidavits identify with the property 8 Pleasant
Place, Brooklyn, New York) would reveal that Mishelevich
submitted this loan application while working in an AGA Capital
office located at 2663 Coney Island Avenue.  Similarly, the
Indictment, search warrants, Title III affidavits, and discovery,
provide the defendants with information about where defendants
Lipkin, Dubin, Buzakher and Badyuk worked, and the locations from
which they operated the alleged mortgage fraud scheme.  Thus, the

41

materials provided to the defendants already provide sufficient notice of the information they seek.

Zhigun also requests that the Government identify the "specific 'false information' the Government is alleging that the defendants provided . . . in obtaining the mortgages in question." (Zhigun Mem. at 7). However, the Indictment clearly describes the nature of the false information that was provided to lenders in furtherance of the mortgage fraud conspiracy. Specifically, the Indictment details that the defendants recruited individuals to act as "straw buyers," of the properties and then submitted loan applications to lenders on behalf of the straw buyers. (Indictment ¶¶ 6-7). The defendants fraudulently improved the straw buyer's credit worthiness by preparing and submitting false and misleading information about the straw buyer's residence, employment, income, assets, and existing debt. (Indictment ¶ 8). The defendants also falsely represented to the lenders that certain straw buyers intended to reside in the property that would secure each mortgage or loan, when, in fact, the defendants intended to use the property for their own investment purposes. (Indictment ¶ 9.) In addition, the defendants procured artificially inflated appraisals of the market value of the properties, which they submitted to lenders in order to obtain   mortgages and other loans in excess of the

actual sale price of the properties securing the loans.
(Indictment ¶ 10.)

　　　　　Nevertheless, Zhigun seeks particulars with regard to
the "false information" allegedly provided to lenders in
connection with 5 specific properties referenced in the overt
acts section of Count One of the Indictment, (Katzberg Aff., Ex.
A, requests 4, 7, 12, 15, and 16 (concerning Indictment ¶ 27(a),
(b), (d), (f) and (g))), as well as the properties referenced in
Counts Nine and Fifteen.  However, in each of these overt acts
and counts, the Indictment specifies the false information
provided to the lenders – i.e. false employment, false financial
information, false information about the borrower's intent to
live in the property, false information about the fair market
value of the property, and omissions about the fact that the
property was subject to New York's rent regulation laws – and the
Indictment indicates that each of these allegedly false
statements or omissions was contained in a loan application that
was produced in discovery for defendants' review.  Additional
details about the false information and material omissions used
to procure these particular loans can be found in the various
search warrant and Title III affidavits.  Detailed information
about the false statements alleged in overt acts (f) and (g) of
Count One, and in Counts Nine and Fifteen, is contained in the

Kaplan complaint.[9]  (See New Aff., Ex. 4 (Kaplan complaint), ¶¶ 12-13).

Zhigun's final request for the identification of all properties that served as collateral for the fraudulently procured loans similarly disregards the substantial amount of information already provided to the defendants.  (Zhigun Mem. at 7-8).  The Indictment, search warrants, Kaplan complaint, and Title III applications all provide specific and detailed information about properties related to the conspiracy charged in Count One of the Indictment.  In addition, the discovery letters list the addresses of additional properties that the Government believes are related to the mortgage fraud conspiracy and for which loan files have been produced to the defendants.

Zhigun's specific requests for the identification of certain properties referenced in the overt acts section of Count One illustrates why a bill of particulars is wholly unnecessary. Zhigun asks the Government to identify the properties related to the loan applications alleged in overt acts (a), (b), (c), (d), and (ii).  (Katzberg Aff., Ex. A).  As discussed above, the address of the property referenced in overt act (a) is easily

_____

[9]  Kaplan similarly requests that the Government specify the false information and material omissions submitted to lenders in connection with the apartments located at 243 West 98th Street. As set forth above, detailed information concerning the fraudulent loan applications related to these apartments is contained in the Indictment and the Kaplan complaint, as well as the discovery produced to the defendants.

deduced from the Title III applications and the discovery as 8 Pleasant Place, Brooklyn, New York. The property referenced in overt act (b) is charged in Count 7 of the Indictment, where it is identified as 225-19 113th Ave, Queens Village, New York. Similarly, the property referenced in overt act (c) is charged in Count 8 of the Indictment, where it is identified as 330 Old Tacy Road, Kauneonga Lake, New York.[10] Thus, the defendants do not need a bill of particulars to identify the addresses of these properties.

In sum, the Indictment, search warrant and Title III affidavits, the Kaplan complaint, and the discovery provide each of the defendants with more than enough information "to prepare for trial, to prevent surprise, and to interpose a plea of double jeopardy should he be prosecuted a second time." Bortnovsky, 820 F.2d at 574. Accordingly, the defendants' motion for a bill of particulars should be denied.

## IV.      CIOFALO'S MOTION FOR A SEVERANCE SHOULD BE DENIED

Defendant John Ciofalo moves for a severance, based on Rules 8 and 14(a) of the Federal Rules of Criminal Procedure. Specifically, Ciafolo argues that he is misjoined with the other defendants in the Indictment "who are charged in unrelated

---

[10]    The property referenced in overt act (ii) may be identified from the Title III applications, Title III recordings and the consensual recordings as 466 Milford Street, Brooklyn, New York.

45

transactions." (Ciofalo Mem. at 7). Ciofalo also argues that he should be severed from the other defendants because of the risk of "spillover prejudice." (Id. at 7-8). Finally Ciofalo contends that the defendants should be severed pursuant to United States v. Casamento, 887 F.2d 1141, 1151-52 (2d Cir. 1989) because of the complexity of the case and the number of defendants. (Id. at 8). Ciofalo's motions should be rejected. Ciofalo is properly joined with his co-defendants for trial, and there is no basis for severance.

### A.   CIOFALO IS PROPERLY JOINED WITH THE OTHER DEFENDANTS AND IS NOT ENTITLED TO SEVERANCE

#### 1.   Applicable Law

Rule 8(b) of the Federal Rules of Criminal Procedure sets forth the standard which governs when joinder both of offenses and defendants is permitted. United States v. Turoff, 853 F.2d 1037, 1043 (2d Cir. 1988). The Second Circuit has interpreted Rule 8(b) to allow joinder of offenses and defendants where two or more persons' criminal acts are "'unified by some substantial identity of facts or participants' or 'arise out of a common plan or scheme.'" United States v. Feyrer, 333 F.3d 110, 114 (2d Cir. 2003) (quoting United States v. Attanasio, 870 F.2d 809, 815 (2d Cir. 1989)). See, e.g., United States v. Cervone, 907 F.2d 332 (2d Cir. 1990) (proper joinder of eighteen defendants in a 102-count indictment with a variety of labor racketeering charges, as well as related charges of obstruction

46

of justice, bribery, and making false statements); <u>United States</u>
v. <u>Weisman</u>, 624 F.2d 1118 (2d Cir. 1980) (proper joinder of
charges and defendants where ten defendants charged with a
variety of offenses relating to creation, operation, and
bankruptcy of a theater).

Even with proper joinder under Rule 8, Federal Rule of
Criminal Procedure 14(a) allows the Court to grant a severance of
defendants' joint trial "[i]f it appears that a defendant or the
government is prejudiced by a joinder." Fed. R. Crim. P. 14(a).
However, a defendant seeking a severance under Rule 14 bears a
heavy burden. Relief under Rule 14 is available only when a
defendant can demonstrate that he will be "so severely
prejudiced" by a joint trial that he will "in effect [be] denied
a fair trial" if he is tried jointly with his co-defendants.
<u>United States</u> v. <u>Minicone</u>, 960 F.2d 1099, 1110 (2d Cir.), <u>cert.</u>
<u>denied</u>, 503 U.S. 950 (1992); <u>see also</u> <u>United States</u> v. <u>Cervone</u>,
907 F.2d 332, 341 (2d Cir. 1990) (to require severance, prejudice
of joint trial must be so substantial as to amount to a
miscarriage of justice), <u>cert.</u> <u>denied</u>, 498 U.S. 1028 (1991).
The prejudice must be so "substantial" that there exists "a
serious risk that a joint trial would compromise a specific trial
right of the moving defendant or prevent the jury from making a
reliable judgment about guilt or innocence." <u>Rosa</u>, 11 F.3d at
341. It is not enough for a defendant to show that he "may have

47

a better chance of acquittal in [a] separate trial[]." <u>Zafiro</u>,
506 U.S. at 540; <u>see also</u> <u>United States</u> v. <u>Panza</u>, 750 F.2d 1141,
1149 (2d Cir. 1984) (explaining that prejudice must be
"sufficiently severe to outweigh the judicial economy that would
be realized by avoiding lengthy multiple trials").

        Even when a risk of substantial prejudice from being
tried with co-defendants arises, severance is <u>not</u> automatic.
"Rule 14 does not require severance even if prejudice is shown;
rather it leaves the tailoring of the relief to be granted, if
any, to the district court's sound discretion." <u>Zafiro</u>, 506 U.S.
at 539.  The Supreme Court has further explained that "less
drastic measures, such as limiting instructions, often will
suffice to cure any risk of prejudice." <u>Id</u>. (citing <u>Richardson</u> v.
<u>Marsh</u>, 481 U.S. 200, 211 (1987)).

        Thus, severance is not required merely because evidence
of the criminal activities of a defendant's co-defendant will be
admitted at a joint trial.  <u>See</u> <u>United States</u> v. <u>Cardascia</u>, 951
F.2d 474, 482-83 (2d Cir. 1991) (no due process violation where
defendants were forced to sit through a month of unrelated
evidence of a separate conspiracy involving co-defendants);
<u>United States</u> v. <u>Casamento</u>, 887 F.2d at 1153, 1167-68 (1989)
(minor defendants, against whom the direct evidence consisted of
only a few tape recorded telephone calls, properly tried as part
of multi-defendant trial which lasted seventeen months); <u>United</u>

States v. Barton, 647 F.2d 224, 241 (2d Cir. 1981) (defendant charged only with obstruction of justice was properly denied a severance from co-defendants charged with bombings, attempted bombings, and racketeering).

As the Second Circuit has recognized, "differing levels of culpability and proof are inevitable in any multi-defendant trial and, standing alone, are insufficient" to require severance." United States v. Carson, 702 F.2d 351, 366-67 (2d Cir. 1983) (citations omitted). Similarly, "the fact that evidence may be admissible against one defendant but not against another defendant does not necessarily require a severance." See United States v. Losada, 674 F.2d 167, 171 (2d Cir. 1982). Where the evidence against the defendant is relatively simple and the Court properly instructs the jury to afford each defendant separate consideration, severance is not required. See id.

### 2. Analysis

Without any explanation, Ciofalo contends that he is misjoined with his co-defendants because they are charged in "unrelated transactions." This conclusory statement is utterly false. All of the defendants in this case, including Ciofalo, are charged in Count One of the Indictment with participating in a massive conspiracy to fraudulently procure mortgage and home equity loans from various banks and other lenders from approximately 2004 through 2007. The other counts in the

Indictment charge the defendants with substantive wire, mail and bank fraud in connection with specific loans obtained as part of the overall conspiracy.   Ciofalo, himself, is charged in Count Eight with wire fraud in connection with a mortgage obtained from BNC bank for a property located in Sullivan County New York.   In Count Eight, Ciofalo is charged along with his co-defendants Aleksander Lipkin and Mariya Badyuk.   Thus, all of the charges in the Indictment arise out of a common scheme or plan that involved Ciofalo and all of his co-defendants.  Ciofalo is properly joined with the other defendants in the case.

Ciofalo's request for severance pursuant to Rule 14 is similarly meritless.  Ciofalo fails to explain how he will be prejudiced in any way by a joint trial with his co-defendants. Contrary to his assertion, Ciafolo's co-defendants are not charged with "various unrelated charges."  (Ciafolo Mem. at 8). Rather, Ciafolo and the other defendants in the Indictment are charged with mortgage fraud, and they were all allegedly part of the same conspiracy.  Moreover,  Ciafolo fails to identify any specific evidence that would be "otherwise inadmissible and highly prejudicial" if he were tried alone.  (Ciafolo Mem. at 8).

In sum, the interests of efficiency and judicial economy weigh strongly in favor of a joint trial in this case. Zafiro, 506 U.S. at 537.  The witnesses and evidence against Ciofalo and his co-defendants is substantially, if not entirely,

identical.  Holding a separate trial for Ciofalo would result in the needless repetition of testimony and argument.  Given the absence of any identifiable prejudice that Ciofalo faces at a joint trial, his motion for severance should be denied.

**B.    The Number Of Defendants Does Not Warrant A Severance For Ciofalo**

The fact that there are more than 10 defendants remaining in the case does not warrant a severance for Ciofalo. Even in the present posture, United States v. Casamento, 887 F.2d 1141, 1151-52 (2d Cir. 1989) does not compel severance in this case.

In Casamento, the Second Circuit held that there was no substantial prejudice occasioned by the 17-month trial of 21 defendants – a case that the Court characterized as a "mega-trial."  887 F.2d at 1151.  Nevertheless, the Court also provided guidance for possible severance of future trials exceeding four months and involving more than 10 defendants.  Id. at 1152.  As former Chief Judge Mukasey has observed, after Casamento, "the court's inquiry in the end remains what it has always been – namely, 'whether, on balance, the fair administration of justice will be better served by one aggregate trial of all indicted defendants or by two or more trials of groups of defendants.'" United States v. Rahman, 854 F. Supp. 254, 262 (S.D.N.Y. 1994) (quoting Casamento).

In this case, there are presently 26 defendants.  Even

51

if the trial in this case were to begin with all of these
remaining defendants (which is obviously extremely unlikely), the
case is projected by the Government to last approximately two
months, over a full year less than the Casamento trial.
Accordingly, even assuming no change in the number of defendants,
Casamento does not mandate severance.  More to the point,
experience suggests that, as the trial date approaches, plea
discussions (which are ongoing and productive) will significantly
alter the parameters of the case.  If, as the trial date
approaches, it appears necessary from a case management
perspective for certain defendants to be severed, the Government
will make a proposal to the Court regarding the severance.  For
the reasons stated, however, this Court need not reach this issue
now.

**V.      CIOFALO'S MOTIONS FOR EARLY DISCLOSURE OF
         PRE-TRIAL MATERIALS SHOULD BE RESOLVED IN ACCORD
         WITH STANDARD PRACTICES IN THIS DISTRICT**

        Finally, defendant John Ciofalo seeks additional
discovery and early disclosure of various materials, including:
(1) Brady material; (2) Giglio and Jencks Act material; (3) Rule
404(b) "other crimes" evidence; and (4) early designation of
documentary evidence.  Ciofalo further requests an audibility
hearing.  Those requests should be denied as well.

        To the extent that Ciofalo seeks additional discovery,
see Ciofalo Mem. at 27-39, the Government believes that it has

52

already provided, or made available, all Rule 16 material in its possession.  The Government is aware that its discovery obligation is a continuing one, and if additional material comes into the Government's possession relating to the charges in this case, the Government will promptly provide this material to the defense.

In response to Ciofalo's motions for: (1) <u>Brady</u> material; (2) <u>Giglio</u> and Jencks Act material; (3) Rule 404(b) "other crimes" evidence; and (4) early designation of documentary evidence; the Government proposes a schedule that is in keeping with the practice of courts in this District in trials of this estimated duration.

<u>First</u>, the Government has previously made representations to defense counsel that it knows of no <u>Brady</u> material, and that it will disclose any such material in a timely fashion if such evidence is discovered.  (<u>See</u> New Aff., Ex. 5 (Discovery Letter), at 6) ("The Government recognizes its obligations under <u>Brady</u> v. <u>Maryland</u>, 373 U.S. 83 (1963), and its progeny.  To date, the Government is unaware of any <u>Brady</u> material regarding [the defendants], but will provide timely disclosure if any such material comes to light.").  This representation is certainly sufficient to satisfy the Government's current <u>Brady</u> obligations.  <u>See</u>, <u>e.g.</u>, <u>United States</u> v. <u>Underwood</u>, 2005 WL 927012, 04 Cr. 424 (RWS) (S.D.N.Y. Apr. 21,

2005) ("The courts of this Circuit repeatedly have denied pretrial requests for discovery orders pursuant to Brady where the government has made such good faith representations.").

Second, the Government intends to provide Jencks Act material and "impeachment" material required by Giglio v. United States, 405 U.S. 667 (1972) to the defendants on a rolling basis beginning one week prior to trial, to be completed prior to the first day of trial.

Ciofalo requests that the Court exercise its discretion to order the Government immediately to turn over Giglio material concerning any relationship that might exist between a witness and the Government (i.e. whether a witness is an informant a cooperator or has been immunized, etc.) and further order the Government to turn over Jencks Act material not less than three weeks before trial.  The Court should decline this invitation. In United States v. Coppa, 267 F.3d 132, 146 (2d Cir. 2001), the Second Circuit held that "the district court exceeded its authority when it ordered the government to disclose all impeachment evidence immediately, pursuant to defendants' request for such, without regard to its materiality and far in advance of trial."  It is common practice in this District for the Government to provide defendants with Jencks Act and Giglio material the Friday before trial.  See United States v. Jacques Dessange, Inc., No. 99 CR. 1182 (DLC), 2000 WL 280050, at *7-*9 (S.D.N.Y. Mar. 14, 2000) ("Giglio material is customarily

54

produced in this District with Section 3500 material in
recognition of the fact that this type of <u>Brady</u> material does not
ordinarily require any independent investigation in order to use
it effectively at trial."); <u>see also</u> <u>United States</u> v. <u>Solomonyan</u>,
451 F.Supp.2d 626, 645 (S.D.N.Y. 2006) (accepting Government
proposal to produce impeachment material on the Friday before the
week in which a witness was expected to testify).  Here, although
the expected duration of the trial is long, the volume of Jencks
Act and <u>Giglio</u> material is not expected to be exceedingly
voluminous.  Accordingly, the Government believes that a rolling
production beginning one week before trial will provide the
defense with sufficient time to review and make use of such
material prior to trial.

　　　　<u>Third</u>, Ciofalo moves for early disclosure and/or
preclusion of 404(b) evidence that the Government may offer at
trial.  The Government proposes making such disclosure two weeks
prior to trial.  <u>See</u>, <u>e.g.</u>,<u>Solomonyan</u>, 451 F.Supp.2d at 646
(S.D.N.Y. 2006) (finding "adequate" two weeks notice of "other
crimes" evidence). The Government believes that this amount of
notice will promote an efficient and timely resolution of any
disputes surrounding this evidence prior to trial.

　　　　<u>Fourth</u>, the Government does not believe that an exhibit
list for documentary evidence is required in advance of trial,
but will provide one when the Government provides exhibit binders
to the defendants at the start of trial.

In addition, the Court should deny Ciofalo's request for an order requiring government agents and attorneys "to retain and preserve all rough notes" as moot, because such an order is unnecessary.  As a general matter, the Government has directed law enforcement agents to retain notes of all witness interviews, even if later incorporated into reports.  The Government will likewise retain any prosecutors' notes that record statements made by witnesses, to the extent such notes exist.  Prior to trial the Government will determine whether any such notes must be disclosed as either Jencks Act or Giglio material.

Finally, Ciofalo's  request for an audibility hearing is premature and should be denied at this time.  Ciofalo requests a hearing to "determine the intelligibility of any tape recording that the government intends to offer against him at trial . . . ."  Ciofalo Mem. at 16.  There are obviously numerous recordings of conversations that were made pursuant to the various Title III applications in this case.  The vast majority of these recordings are audible and intelligible.   As we approach the trial date, the Government plans to provide the defendants with a list identifying the specific recorded conversations it expects to introduce at trial, as well as transcripts and translations that the Government will provide to the jury.

As a preliminary matter, the Court should wait for Ciofalo and the other defendants to specifically identify those portions of each of the recordings that they claim are inaudible

and then require the defendants to explain why it is that such inaudibility renders the recording, or a portion of the recording, untrustworthy.  Even after they have done so, the defendants must then explain why the audible portions, within a recording session, are rendered untrustworthy even if the Court were to determine that some other section is inaudible.

At any future audibility hearing — which the Government believes the Court does not necessarily have to hold in the presence of the parties — the Court should review the challenged portions of the recorded sessions both for probative value and for audibility.  Even if significant portions of a particular conversation are inaudible, the Court should only exclude the conversation or portion of the conversation if it is clear that the probative value of the audible portions are outweighed by the potential of the recordings to mislead the jury.  See United States v. Arango-Correa, 851 F.2d 54, 58-59 (2d Cir 1988);United States v. Bryant, 480 F.2d 785, 790 (2d Cir. 1973)).  The Government submits that, to the extent the defendants ultimately challenge any of the recordings, none of the recordings will be excluded.

Furthermore, transcripts of recorded conversations, where accurate, are routinely admitted as an aid in listening to tape recordings.  See, e.g., United States v. Chiarizio, 525 F.2d 289, 293 (2d Cir. 1975); Bryant, 480 F.2d at 790-91.  To the extent that the Government and a defendant may end up disagreeing

57

about the accuracy of a transcript the proper procedure is not to exclude the transcript but to receive transcripts from both sides. <u>Chiarizio</u>, 525 F.2d at 293.  In the context of an audibility hearing, transcripts are particularly useful because the fact that recordings can be accurately transcribed is evidence that they are audible.

<u>**CONCLUSION**</u>

For the reasons set forth above, the Court should deny the defendants motions in their entirety without a hearing.

Dated:      February 22, 2008
            New York, New York

                        Respectfully submitted,

                        MICHAEL J. GARCIA
                        United States Attorney


                    By:_____/s/_____
                        JONATHAN B. NEW
                        KATHERINE R. GOLDSTEIN
                        Assistant United States Attorneys
                        Tel. No.: (212) 637-1049/2641

58

## <u>AFFIRMATION OF SERVICE</u>

I, Jonathan B. New, affirm under penalty of perjury as follows:

1.    I am an Assistant United States Attorney in the Southern District of New York.

2.    On February 22, 2008, I caused a copy of the attached Government's Memorandum of Law in Opposition to Defendants' Pretrial Motions and supporting affidavit to be served by ECF on the defendants' attorneys.

Dated:    New York, New York
          February 22, 2008


_____/s/_____
Jonathan B. New
Assistant United States Attorney
Telephone: (212) 637-1049