**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

--------------------------------------------------

IN THE MATTER OF THE APPLICATION OF
THE UNITED STATES OF AMERICA FOR
AUTHORIZATION TO INTERCEPT WIRE
COMMUNICATIONS OCCURRING OVER THE
CELLULAR TELEPHONE ASSIGNED NUMBER (917)
628-4994 WITH INTERNATIONAL MOBILE
SUBSCRIBER IDENTITY NUMBER ("IMSI")
310150990342434

**AFFIDAVIT IN SUPPORT**
**OF APPLICATION FOR**
**AUTHORIZATION TO**
**INTERCEPT WIRE**
**COMMUNICATIONS**

--------------------------------------------------

STATE OF NEW YORK          )
COUNTY OF NEW YORK         : ss.:
SOUTHERN DISTRICT OF NEW YORK   )

J. KEVIN O'DONNELL, a Special Agent with the Federal
Bureau of Investigation ("FBI"), being duly sworn, deposes and
states:

## INTRODUCTION

1.    I am an "investigative or law enforcement officer
of the United States" within the meaning of Section 2510(7) of
Title 18, United States Code, that is, an officer of the United
States who is empowered by law to conduct investigations of and
to make arrests for offenses enumerated in Section 2516, Title
18, United States Code.  I have been a Special Agent with the FBI
for approximately 10 years.  I have participated in numerous
investigations of Eurasian organized crime and, among other
things, have conducted or participated in surveillance, the
execution of search warrants, debriefings of informants and
reviews of taped conversations and business records.

2.    I submit this affidavit in support of an

application for an order pursuant to Section 2518 of Title 18, United States Code, authorizing the interception and recording of wire communications concerning offenses enumerated in Section 2516 of Title 18, United States Code – that is, offenses involving wire, mail and bank fraud, conspiracy to do the same and attempts to do the same, in violation of 18 U.S.C. §§ 1341, 1343, and 1344 (the "TARGET OFFENSES").[1]

3.    I believe that there is probable cause to believe that these offenses have been committed, are being committed, and will continue to be committed by ALEX GORVITS, ALEKSANDR LIPKIN, a/k/a "Alex," a/k/a "Shorty," IGOR MISHELEVICH, OLGA LAGUTA, PATRICK MULLINGS, and others unknown (the "TARGET SUBJECTS").

4.    The requested Order is sought for a period of time until the interception fully reveals the manner in which the above-named individuals and their confederates participate in the above-described offenses, or for a period of thirty (30) days, whichever occurs first, pursuant to Title 18, United States Code, Section 2518(5).  Pursuant to Section 2518(5) of Title 18, United States Code, it is further requested that the 30-day period be measured from the earlier of the date on which investigative or law enforcement officers begin to conduct interception under this

---

[1]    Although not a predicate offense under 18 U.S.C. § 2516, there is probable cause to believe that the TARGET SUBJECTS have aided and abetted and are aiding and abetting those substantive offenses, in violation of 18 U.S.C. § 2.

2

Court's Order or ten days from the date of this Court's Order.

5.   This case is being investigated by the Federal Bureau of Investigation and the New York City Police Department ("NYPD").

6.   I have personally participated in the investigation of the offenses referred to in paragraph two above, and make this affidavit based on my personal participation in this investigation and based on reports made to me by FBI agents and analysts and other law enforcement authorities.  Except where otherwise noted, the information set forth in this affidavit has been provided to me by other law enforcement agents who have assisted in the investigation.  Unless otherwise noted, wherever in this affidavit I assert that a statement was made, the statement was made by another law enforcement officer (any of whom may have had either direct or hearsay knowledge of that statement) to whom I or other law enforcement officers have spoken or whose reports I have read and reviewed.  Such statements are reported in substance and in part, unless otherwise indicated.  Likewise, information resulting from surveillance sets forth either my personal observations or information provided directly or indirectly through other law enforcement officers who conducted such surveillance.

7.   Since this affidavit is being submitted for the limited purpose of securing an order authorizing the interception

of wire communications, I have not included details of every aspect of this investigation to date. Facts not set forth herein are not being relied on in reaching my conclusion that orders should be issued. Nor do I request that this Court rely on any facts not set forth herein in reviewing this application for an order authorizing the interception of wire communications. Based upon this knowledge, I allege the facts contained in the paragraphs below to demonstrate that:

### DESIGNATED TELEPHONE

8.    There is probable cause to believe that evidence of the commission of the TARGET OFFENSES will be obtained through the interception of communications of the TARGET SUBJECTS and others, including Akin Ayorinde, Umana Oton, and Alex Rozenzaft (the "INTERCEPTEES"). Furthermore, there is probable cause to believe that the TARGET SUBJECTS have been using, are using, and will in the future use the following telephone to make wire communications in furtherance of, in connection with, to facilitate, to accomplish, and to commit the TARGET OFFENSES:

a.    the cellular telephone assigned call number (917) 628-4994, with International Mobile Subscriber Identity Number ("IMSI") 310150990342434, and service provided by Cingular Wireless, LLC., which is subscribed to by Alex Gorvits at 274 Norway Avenue, Staten Island, New York (the "TARGET

4

CELLPHONE").[2]

9. I have been informed by other law enforcement personnel who are familiar with the applicable telephone technology that a "portable cellular telephone" (or a "mobile telephone") can be used both within a vehicle and outside a vehicle through the use of a portable battery pack. The cellular telephone system divides the New York City and other metropolitan area into many small coverage areas, which are called "cells." As a vehicle in which a portable cellular telephone is located, or the cellular telephone itself, is moved from one cell to another, transmitters within each cell and a master switching network permit "wire communications" to be completed. Each portable cellular telephone that does not contain party lines bears a unique IMSI number and an assigned telephone number. It is requested that interception be permitted over the TARGET CELLPHONE, and any other telephone numbers accessed through the above-listed IMSI number for the TARGET CELLPHONE, and any IMSI number accessed through the phone number assigned to the TARGET CELLPHONE. It is further requested that background conversations, in the vicinity of the TARGET CELLPHONE while it is off the hook or otherwise in use, also be permitted to be

---

[2]    The TARGET CELLPHONE utilizes an IMSI encoded on a computer chip and located inside the instrument. This IMSI number is transferable from telephone to telephone. Accordingly, this application seeks authorization to intercept communications occurring over any telephone or telephone numbers accessed by or through the use of the IMSI number identified above.

intercepted.

10.   Because of the mobility of portable cellular
telephones, pursuant to Title 18, United States Code, Section
2518(3), authorization is requested for interception of wire
communications within the Southern District of New York, and
outside that jurisdiction but within the United States in the
case of a mobile interception device.

11.   It is anticipated that the subjects of this
investigation will use the TARGET CELLPHONE to place calls and
relay other electronic messages to and from New York, New York,
as well as other locations.  This belief is supported by the
facts described below.  Pursuant to United States v. Rodriguez,
968 F.2d 130 (2d Cir. 1992), a Court in the Southern District of
New York is empowered to issue an Order for the interception of
wire communications over telephones located in other districts,
as long as the interceptions of these communications are first
heard in the Southern District of New York.

12.   In connection with the telecommunication companies
that provide the service for the TARGET CELLPHONE, all
interceptions will automatically be routed to New York, New York,
regardless of where the telephone calls are placed to or from.
Accordingly, all interceptions will first be heard in the
Southern District of New York.

13.   During the requested wire surveillance, all

6

monitoring will be performed in New York, New York, by law enforcement officers authorized under Section 2510(7) of Title 18, United States Code, including special agents of the FBI and government employees or individuals operating under a contract with the Government, who will be acting under the supervision of investigative or law enforcement officers authorized to conduct the interception.

### OBJECTIVES

14. There is probable cause to believe that the interception of wire communications, the authorization for which is sought herein, will help to reveal: (i) the nature, extent and methods of operation of the TARGET SUBJECTS' wire, mail and/or bank fraud activities; (ii) the identities of the TARGET SUBJECTS, their accomplices, aiders and abettors, co-conspirators and participants in their illegal activities; (iii) the receipt and distribution of contraband and money involved in those activities; (iv) the locations and items used in furtherance of those activities; (v) the existence and locations of records; (vi) the location and source of resources used to finance their illegal activities; and (vii) the location and disposition of the proceeds from those activities. In addition, these wire communications are expected to constitute admissible evidence of the commission of the above-described offenses.

## PRIOR APPLICATIONS

15.    I have been informed that reviews have been done
of the electronic surveillance files of the Bureau of Immigration
and Customs Enforcement, the Drug Enforcement Administration and
the Federal Bureau of Investigation.[3]  Based on these reviews, I
have been informed that there have been no prior applications for
Court authorization to intercept wire, oral, or electronic
communications of the TARGET SUBJECTS, or over the facilities or
places named herein.

I.    **THERE IS PROBABLE CAUSE TO BELIEVE THAT THE
      TARGET SUBJECTS WILL USE THE TARGET CELLPHONE
      IN FURTHERANCE OF THE TARGET OFFENSES**

16.    As set forth in greater detail below, there is
probable cause to believe that the TARGET SUBJECTS are
participating in an ongoing mortgage fraud scheme and are using
the TARGET CELLPHONE to commit the TARGET OFFENSES.

17.    I and other law enforcement agents have
interviewed a cooperating witness ("CW-1"),[4] who has been
involved in several fraudulent real estate transactions with ALEX
GORVITS.  CW-1 provided the following information:

---

[3]    A check of FBI, DEA and BICE files was completed on or about
May 8, 2006.

[4]    CW-1 has pled guilty in New York state court, pursuant to a
cooperation agreement, to three counts of criminal possession of
a weapon.  CW-1 is providing information in hopes of receiving a
reduced sentence.  The information provided to date by CW-1 has
in many instances been corroborated and has proven to be
reliable.

a.    ALEX GORVITS is employed by AGA Capital NY
Inc. ("AGA Capital").

b.    For the first five real estate transactions
that CW-1 participated in with GORVITS, CW-1 identified low value
properties that were for sale in Brooklyn, New York, and CW-1
also recruited individuals to serve as nominal, or "straw,"
purchasers for each property.  Each of these "straw purchasers"
had high credit ratings and was paid a small fee for allowing
GORVITS to use their name and personal information.  GORVITS paid
CW-1 approximately $100,000 for finding both a "straw purchaser"
and a property.  After the first five transactions, GORVITS began
supplying the straw purchasers, and CW-1 was mainly responsible
for identifying properties.

c.    After a property was identified by CW-1 and a
"straw purchaser" was recruited, GORVITS paid certain appraisers
to appraise the property at an inflated value.  GORVITS then used
the inflated appraisal and the "straw purchaser's" high credit
rating to obtain mortgages from out of state banks for the
appraised value of the property.

d.    GORVITS convinced the sellers of each
property to close the transaction at a price greater than the
historical value of the property but less than the appraised
value.  GORVITS told the sellers that the additional amount of
the mortgage would be used to pay various fees, but, in truth,

9

GORVITS made a profit on the sale that was equivalent to the difference between the inflated amount of the mortgage and the actual price at which the property was sold.

e.   If a down payment was required for the purchase of the property, GORVITS and/or an attorney chosen by AGA Capital would create a fake cashier's check, or "show check," in the name of the "straw purchaser." GORVITS would present the "show check" to the mortgage bank.

f.   After a property was bought in the name of a "straw purchaser," CW-1 usually would make a few mortgage payments out of the $100,000 fee that he received from GORVITS. However, soon after the transaction was closed, GORVITS would sell, or "flip," the property to another "straw purchaser" who had obtained a mortgage in the amount of a further inflated appraisal of the property.

g.   In many of the real estate transactions completed by CW-1 and GORVITS, GORVITS also paid unusually high fees to the title company and bank attorney who participated in the transaction. CW-1 identified Akin Ayorinde and Umana Oton as two attorneys who GORVITS frequently hired to assist in his fraudulent real estate purchases.

h.   CW-1 also identified ALEKSANDR LIPKIN as a mortgage broker who works with GORVITS at AGA Capital NY Inc. ("AGA Capital") in Brooklyn, New York, and who also engaged in

10

fraudulent mortgage transactions.

   i. CW-1 further identified PATRICK MULLINGS as a real estate processor who found "straw purchasers" for GORVITS.

   18. CW-1 also informed me that since CW-1 was arrested in or about May 2005, GORVITS has been in contact with CW-1 in prison and offered to pay CW-1 $40,000 if CW-1 could recruit new "straw purchasers" for GORVITS.

   19. I and other law enforcement agents have interviewed another cooperating witness ("CW-2"),[5] who is familiar with AGA Capital and its personnel.  Based upon my conversations with CW-2, I have learned the following information:

   a. AGA Capital had two locations. One office was located at 20-54 86th Street, Brooklyn, New York.  The other office is located at 2729 Coney Island Avenue, Brooklyn, New York.

   b. LIPKIN occupies a main executive office on the first floor of the Coney Island Avenue office.

   c. LIPKIN told CW-2 that he had recently purchased a multi-million dollar home, and LIPKIN asked CW-2 for

---

[5] CW-2 pled guilty, pursuant to a cooperation agreement, to one count of racketeering in the Eastern District of New York. CW-2 is currently serving a term of five years' probation as part of his sentence.  CW-2 is providing information pursuant to his cooperation agreement.  The information provided to date by CW-2 has in many instances been corroborated and has proven to be reliable.

advice on how to hide LIPKIN's assets from law enforcement authorities.

d.    CW-2 identified a photograph of IGOR MISHELEVICH as depicting an individual that he has seen at AGA Capital's 86th Street location.

e.    CW-2 identified a photograph of ALEX GORVITS as depicting an individual who worked at AGA Capital's 86th Street location and currently works at AGA Capital's Coney Island Avenue location.

20.   I have reviewed public records and a Suspicious Activity Report ("SAR") relating to a series of real estate transactions involving a house located at 1370 Park Place, Brooklyn, New York ("1370 Park Place"). Based upon these records, I have learned the following information:

a.    On or about November 15, 2004, 1370 Park Place New York was sold for approximately $565,000 to a "straw purchaser" ("P-1") who had obtained two mortgages in the total amount of $565,000. P-1 defaulted on the first mortgage payment.

b.    Participants in the sale of the home included CW-1; ALEX GORVITS, who was the mortgage broker; Akin Ayorinde, who was the real estate attorney for the seller; and Umana Oton, who was the real estate attorney for the borrower.

c.    On or about April 4, 2005, P-1 had a telephone conversation with the analyst who prepared the SAR.

12

During that conversation, P-1 told the analyst, in substance and in part, that P-1 had let another person use her name and personal information to purchase 1370 Park Place, that P-1 did not live in 1370 Park Place, and P-1 had never seen the inside of the property.

21. I have reviewed public records relating to a series of real estate transactions involving a house located at 177 Vernon Avenue, Brooklyn, New York ("177 Vernon"). CW-1 has informed me that 177 Vernon was purchased by ALEX GORVITS using a "straw purchaser." According to the records I have reviewed, 177 Vernon was sold for approximately $550,000 to OLGA LAGUTA, on or about March 14, 2005. LAGUTA obtained two mortgages on the property in the total amount of $550,000.

22. I have reviewed public records relating to a series of real estate transactions involving a house located at 726 Monroe Street, Brooklyn, New York ("726 Monroe"). CW-1 has informed me that 726 Monroe was one of the properties that CW-1 purchased with ALEX GORVITS using a "straw purchaser." According to the records I have reviewed, 726 Vernon was sold twice on or about April 18, 2003 and a third time on March 31, 2005 for approximately $585,000. The third purchaser obtained two mortgages on the property in the total amount of $585,000. Umana Oton was listed as an attorney who worked on the second sale. Participants of the third sale included, PATRICK MULLINGS,

who was given a power of attorney by the seller of 726 Monroe;
Akin Ayorinde, who acted as a real estate attorney; and Alex
Rozenzaft, who acted as a notary.

23.  I have reviewed a SAR relating to a real estate
transaction involving a house located at 1919 Pacific Street,
Brooklyn, New York ("1919 Pacific").  Based upon that SAR, I have
learned the following information:

a.  In or about October 2003, 1919 Pacific was
appraised at a value of $450,000.

b.  Based upon the appraised value, the purchaser
of 1919 Pacific Street obtained two mortgages in the total amount
of $450,000 on or about April 21, 2005.

c.  The mortgage loans were originated with AGA
Capital, and the closing agent for the transaction was IGOR
MISCHELEVICH.

c.  A second appraisal of 1919 Pacific was
completed on or about September 29, 2005 and reflected a value of
$240,000.

d.  As of in or around December 2005, 1919
Pacific was in foreclosure with estimated losses of approximately
$518,283.

24.  I and other FBI agents have conducted surveillance
on the AGA Capital branches located at 20-54 86th Street,
Brooklyn, New York and at 2729 Coney Island Avenue, Brooklyn, New

14

York, on multiple occasions. AGA Capital has recently changed its name to Northside Capital. As of April 2006, the 86th Street location appears to have been closed. I have observed GORVITS and LIPKIN enter and leave the business on a regular basis.

**TARGET OFFENSE RELATED CALLS ON TARGET CELLPHONE**

25. ALEX GORVITS has used the TARGET CELLPHONE to engage in multiple conversations concerning his ongoing participation in mortgage fraud related activities. The following is a chronological presentation of portions of some of those intercepted communications. The descriptions of the conversations are based upon tape recordings of the conversations and transcriptions made by FBI analysts. Where necessary and possible, I have drawn on my general training and experience, as well as my involvement in this investigation, to include interpretations of certain terms and phrases in parentheses, and to provide the content of certain of the calls. Where necessary and possible, I have also included information obtained from other sources.

26. On or about March 6, 2006, CW-1 made a consensually recorded telephone call to GORVITS, who was using the TARGET CELLPHONE. During this conversation, CW-1 told GORVITS, in substance and in part, that he had found two "straw buyers" and asked GORVITS how much money CW-1 would make on transactions using those "straw buyers." GORVITS cautioned CW-1

that he was uncomfortable using "that kind of wording . . . over the phone." Nevertheless, GORVITS told CW-1 that GORVITS had "a very nice property" but that he needed a person with a credit score of "over seven hundred." GORVITS also told CW-1 that he would pay CW-1 $50,000 for one purchaser but that the purchaser would have to "come twice" because the real estate transaction would include both a "conventional mortgage" and a subsequent "home equity" loan on the same property within a week of the closing on the sale.

27.    On or about March 16, 2006, CW-1 made another consensually recorded telephone call to GORVITS, who was using the TARGET CELLPHONE. During this conversation, GORVITS told CW-1, in substance and in part, that he had "deals all the time . . . some are good, some are no good, but they keep coming." Specifically, GORVITS told CW-1 that he was looking for a buyer for a "brownstone in Clinton Hill." GORVITS also reassured CW-1 that he was willing to continue working with CW-1, even though CW-1 was "locked up."

## TARGET CELLPHONE TOLL ANALYSIS

28.    I have reviewed pen register telephone toll records for the TARGET CELLPHONE for the period from March 15, 2006 through May 21, 2006, exclusive of May 14 and 15, 2006 (the "Target Period"). These records reflect that during the Target Period, the TARGET CELLPHONE made or received a total of 5213

16

calls to or from approximately 372 different telephone numbers.

29.  Telephone records reflect that during the Target Period, the TARGET CELLPHONE made or received 62 calls to or from a cellular telephone assigned call number (347) 374-3465, which is subscribed to OLGA LAGUTA, with the most recent call on May 13, 2006.

30.  Telephone records reflect that during the Target Period, the TARGET CELLPHONE made or received 137 calls to or from a cellular telephone assigned call number (646) 244-8318, which is also subscribed to OLGA LAGUTA, with the most recent call on May 18, 2006.

31.  Telephone records reflect that during the Target Period, the TARGET CELLPHONE made or received 31 calls to or from a cellular telephone assigned call number (516) 761-1072, which is subscribed to ALEKSANDR LIPKIN, with the most recent call on May 9, 2006.

32.  Telephone records reflect that during the Target Period, the TARGET CELLPHONE made or received 85 calls to or from a cellular telephone assigned call number (347) 247-2899, which is subscribed to ALEX LIPKIN, with the most recent call on May 17, 2006.

33.  Telephone records reflect that during the Target Period, the TARGET CELLPHONE made or received 219 calls to or from a telephone assigned call number (718) 373-1116, which is

17

subscribed to Alex Rozenzaft, PC, with the most recent call on May 18, 2006.

34.   Telephone records reflect that during the Target Period, the TARGET CELLPHONE made or received 16 calls to or from a telephone assigned call number (718) 834-9039, which is subscribed to Akin Ayorinde PC, with the most recent call on April 24, 2006.

35.   Telephone records reflect that during the Target Period, the TARGET CELLPHONE made or received 13 calls to or from a telephone assigned call number (718) 834-8200, which is also subscribed to Akin Ayorinde PC, with the most recent call on April 26, 2006.

36.   Telephone records further reflect that during the Target Period, the TARGET CELLPHONE made 22 calls to a cellular telephone assigned call number (917) 337-4166, which is subscribed to Akin Ayorinde PC, with the most recent call on May 1, 2006.

37.   Telephone records additionally reflect that during the Target Period, the TARGET CELLPHONE made or received 29 calls to or from a cellular telephone assigned call number (917) 589-7000, which is subscribed to IGOR MISHELEVICH, with the most recent call on May 17, 2006.

18

## II.   ALTERNATIVE INVESTIGATIVE TECHNIQUES HAVE BEEN TRIED AND FAILED OR APPEAR UNLIKELY TO SUCCEED THUS THERE IS A NEED FOR THE INTERCEPTION OF WIRE COMMUNICATIONS

38.  As discussed above, the purpose of this investigation is to identify, locate, and develop evidence against the TARGET SUBJECTS, and to identify the means by which those persons are committing the TARGET OFFENSES.   Interception of wire communications occurring over the TARGET CELLPHONE is necessary to reveal the nature and scope of the TARGET SUBJECTS' mortgage fraud activities, the source of financing for the organization, and the location and disposition of the proceeds from those activities.   In addition, it is anticipated that new targets will be identified through intercepted communications. It is only through the combination of wire surveillance, visual surveillance and other investigatory tools that the agents expect to identify fully the nature and scope of the organization.   As indicated below, several investigative techniques have been tried, or reasonably appear likely to fail if tried, or are likely to be too dangerous to employ to achieve these objectives:

a.   Use of undercover officers will not be effective in achieving the complete goals of the investigation. By debriefing cooperating witnesses, we have been able to identify a number of the TARGET SUBJECTS.   However, the TARGET SUBJECTS appear to be a discrete, tightly-knit group, which would not be susceptible to penetration by outsiders not previously

19

known to the conspiracy.  Although CW-1 might be able to
introduce an undercover officer as a potential "straw purchaser,"
the undercover officer would not be able to withdraw from the
real estate transaction prior to its closing without raising the
suspicion of the TARGET SUBJECTS.  If an undercover agent were to
participate in the closing of a fraudulent real estate
transaction, law enforcement authorities would be left in
possession of the property and/or have to reimburse the victim
lender for the substantial loss it would suffer after
foreclosure.  In any event, even if an undercover officer
participated in a fraudulent real estate transaction with the
TARGET SUBJECTS, he would not be able to learn the identities of
all of the individuals involved, the financing or the
organization, or the disposition of proceeds.  As a result, the
use of undercover officers at this time is not available as an
alternative technique to wire surveillance of the TARGET
CELLPHONE.

            b.    Similarly, the use of confidential informants
is unlikely to work.  As stated above, the tightly-knit nature of
this conspiracy makes it unlikely that an informant without prior
acquaintance with the TARGET SUBJECTS could gain entry to the
conspiracy.  In addition, there is a strong likelihood that the
conspirators would find a "cold" approach from an unknown CI to
be highly suspicious, and alter their behavior in a manner that

would make the instant investigation far more difficult.
Consequently, use of CIs is not available as an alternative
technique to wire surveillance of the TARGET CELLPHONE.

         c.   The FBI has gained valuable information
concerning GORVITS and other TARGET SUBJECTS' mortgage fraud
activities by debriefing a cooperating witness, CW-1.  However,
this cooperating witnesses can provide insight only into GORVITS'
and his co-conspirators' historical activities and not into
present mortgage fraud activities.

         d.   The FBI has conducted physical surveillance
of GORVITS and of AGA Capital's two offices, however, GORVITS and
his co-conspirators conduct their real estate transactions inside
private offices and buildings.  As a result, this method of
investigation has met with little success and has not led to our
discovery of further information concerning GORVITS's mortgage
fraud activities.  Physical surveillance in and of itself,
however, is useful mainly in generating information concerning
the identity of an individual, where he or she resides, locations
he or she frequents, and the identities of the persons with whom
he or she meets.  FBI surveillance has, for instance, identified
AGA Capital as a business address frequented by GORVITS and
LIPKIN.  The surveillance provides limited direct evidence of the
significance of what occurs at such locations or meetings,
however.  Thus, without wire surveillance to assist agents in

understanding the purpose of various meetings and facilitating discrete surveillance, physical surveillance is expected to be of limited utility.  In addition, with the knowledge provided beforehand by wire surveillance that a meeting is to take place at a given location, it may be possible to establish physical surveillance at that location in advance, thus minimizing the risks of discovery inherent in following subjects or remaining at target locations for long periods of time.

           e.    Telephone toll records and pen registers will provide only limited information.  This information alone will not enable law enforcement officers to identify with certainty the persons involved in the mortgage fraud enterprise, or the contents of their telephone conversations.  The interception of wire communications, however, will enable law enforcement officers to identify target subjects and the content of their fraud-related communications.

           f.    Use of a federal grand jury does not appear to be a promising method of investigation.  All the TARGET SUBJECTS and other witnesses identified by law enforcement are themselves participants in the mortgage fraud activities under investigation.  These individuals face prosecution themselves; it is unlikely therefore that any of them would testify voluntarily. Nor would it be desirable at this time to seek immunity for such individuals and to compel their testimony.  Immunizing them could

thwart the public policy that they be held accountable for their crimes. The issuance of grand jury subpoenas likely would not lead to the discovery of critical information and undoubtedly would alert the TARGET SUBJECTS to the pendency of this investigation. For many of the same reasons, the use of witness interviews does not appear to be a promising method of investigation. Again, witnesses who could provide additional relevant evidence have not been identified or would themselves be participants in the mortgage fraud activities under investigation. Grand Jury subpoenas have been issued to banks and lending institutions in an effort to identify other individuals and bank accounts that might be involved in the TARGET SUBJECTS's mortgage fraud activities, however, no such accounts or individuals have been identified yet.

g. Neither applications for search warrants, nor trash pulls, are appropriate at this stage of the investigation, as the locations where the TARGET SUBJECTS currently file, store, or hide documents related to their fraudulent real estate transactions and the proceeds of those transactions have not been identified. Moreover, investigative methods used to date do not by themselves seem likely to yield this information. Wire surveillance will assist law enforcement in identifying such locations, so that search warrants for such locations may be obtained at a later time.

23

## MINIMIZATION

39.   All monitoring of wire communications over the
TARGET CELLPHONE will be minimized in accordance with Chapter 119
of Title 18, United States Code.

40.   The "investigative or law enforcement officers of
the United States" and translators, if necessary, who are to
carry out the requested interception of wire communications, will
be instructed concerning the steps they should take to avoid
infringing upon any attorney-client privilege or other recognized
privileges.   However, to the extent that communications are
intercepted among the TARGET SUBJECTS and/or INTERCEPTEES that
concern reals estate or mortgage transactions that are reasonably
believed to be in furtherance of the ongoing scheme to defraud
described above, those communications will be monitored pursuant
to the crime/fraud exception to attorney-client privilege.   See,
e.g., United States v. Ballard, 779 F.2d 287, 292 (5th Cir. 1986)
(attorney need not be aware of the client's fraudulent or
criminal intent); In re Grand Jury Subpoena Duces Tecum Dated
September 15, 1983, 731 F.2d 1032, 1039 (2d Cir. 1984)
(articulating standard as requiring "that a prudent person have a
reasonable basis to suspect the perpetration of a crime or fraud,
and that the communications were made in furtherance thereof").
Nevertheless, all communications intercepted will be conducted in
such a way as to minimize the interception of communications not

24

otherwise criminal in nature or subject to interception under
Chapter 119, Title 18, United States Code.  All monitoring will
cease when it is determined that the monitored conversation is
not criminal in nature.  Interception will be suspended
immediately when it is determined through voice identification,
physical surveillance, or otherwise, that neither the TARGET
SUBJECTS, the INTERCEPTEES or any of their confederates, when
identified, are participants in the conversation, unless it is
determined during the portion of the conversation already
overheard that the conversation is criminal in nature.  If an
interception is minimized, monitoring agents shall spot check to
insure that the conversation has not turned to criminal matters.

         41.  It is requested that the order provide that, if
necessary, translators be authorized to assist in conducting this
wire surveillance and to receive disclosure of intercepted
communications.  Certain subjects of this investigation are
expected to communicate with each other in the Russian language.
It is therefore necessary to secure the services of translators
in order to assist the agents in monitoring the wire surveillance
and translating the intercepted communications.  All such
translators will be under contract to the FBI and will be
directly supervised by the FBI and deputized law enforcement
officers of NYPD.  It is further requested, pursuant to Section
2518(5), Title 18, United States Code, that in the event the

intercepted communications are in a code or foreign language, and an expert in that code or foreign language is not reasonably available during the interception period, that minimization may be accomplished as soon as practicable after such interception.

## **AUTHORIZATION REQUEST**

42.  Based on the foregoing, it is my opinion that the interception of wire communications occurring over the TARGET CELLPHONE, as specified above, is essential to uncover the full scope of the TARGET SUBJECTS' mortgage fraud activities.

43.  In as much as the illegal operation described herein is a continuing conspiracy involving numerous persons as yet unidentified and unknown, it is requested that it be ordered, as more fully stated in the accompanying application, that authorization to intercept not terminate when the sought wire communications are first obtained, but continue until interception fully reveals the objectives set forth above, or for a period of thirty (30) days, whichever is earlier.  The 30-day period shall be measured from the earlier of the date on which investigative or law enforcement officers begin to conduct interception under this Court's Order or ten days from the date of this Court's Order.

44.  It is further requested that, pursuant to Title 18, United States Code, Section 2703, Cingular Wireless, LLC. Be ordered to provide originating and terminating cell site

information for the intercepted wire communications occurring over the TARGET CELLPHONE, by permitting the FBI's SMART System to access such information.  Such information will assist the FBI in locating the TARGET SUBJECTS, and is therefore relevant and material to its investigation.

45.  Pursuant to the provisions of Title 18, United States Code, Sections 2518(4), it is requested that it be ordered that Cingular Wireless, LLC., the service provider for the TARGET CELLPHONE, and any other service provider for the TARGET CELLPHONE, furnish the technical assistance necessary to accomplish the interception unobtrusively and with a minimum of interference with such services as those providers accord the persons whose communications are to be intercepted (including all dial digits for both incoming and outgoing calls), pen register information, and audio interception capability), and access to the TARGET CELLPHONE'S voicemail box(es) or voicemail features to contemporaneously intercept messages left on or retrieved from TARGET CELLPHONE'S voicemail box(es) or voicemail systems.  The assistance of Cingular Wireless, LLC. is required to accomplish the objectives of the requested interceptions.  Reasonable expenses incurred pursuant to this activity will be processed for payment by the FBI.

46. It is requested that this affidavit, as it reveals an ongoing investigation, be sealed until further order of the Court in order to avoid premature disclosure of the investigation, guard against fugitives, and better ensure the safety of agents and others.


J. KEVIN O'DONNELL
SPECIAL AGENT
FEDERAL BUREAU OF INVESTIGATION


Sworn to before me this
26th day of May, 2006

UNITED STATES DISTRICT JUDGE
SOUTHERN DISTRICT OF NEW YORK